## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**CARL LEE STEPHENS, II,**

      **Plaintiff,**

v.                            **Civil Action No. 3:13cv03**
                                     **(The Honorable Gina Groh)**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

### REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant, the Commissioner of the Social Security Administration ("Defendant" and sometimes "the Commissioner"), denying the Plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

### I. PROCEDURAL HISTORY

Carl Lee Stephens, II ("Plaintiff"), filed an application for SSI on November 4, 2008, alleging disability since October 20, 2008, due to recurrent, severe major depression; bipolar disorder; bone spurs in his neck; spondylosis of his cervical spine; and hepatitis C (R. 127, 148). The state agency denied Plaintiff's application initially and on reconsideration (R. 64-5). Plaintiff requested a hearing, which Administrative Law Judge Elizabeth B. Dunlap ("ALJ") held on November 17, 2010, and at which Plaintiff, represented by counsel, Jonathan Bowman, and Anthony Michael, a vocational expert ("VE"), testified (R.35, 77). After ALJ Dunlap conducted the hearing, made a determination about the case, and issued instructions for a decision but before that decision was issued, she was transferred

to a different hearing office. This case was transferred to ALJ Charlie Paul Andrus by the chief judge of the hearing office (R. 18, 27). On May 2, 2011, ALJ Andrus entered a decision finding Plaintiff was not disabled (R. 18-27). Plaintiff timely filed a request for review of the ALJ's decision with the Appeals Council (R.12). On November 16, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-3).

## II. FACTS

Plaintiff was born on January 19, 1962, and was forty-nine (49) years old when the ALJ's decision was issued (R. 127). The Plaintiff has a high school education, attended welding school, and worked as delivery person and construction foreman (R. 40, 149, 208).

In October 2005, Dr. DeNunzio diagnosed Plaintiff with chronic pain syndrome. He prescribed a Duragesic patch (R. 222-23). He treated Plaintiff for back pain in November 2005. He diagnosed lumbar strain with radiculopathy and ulnar radiculopathy. He prescribed Percocet (R. 220).

A November 18, 2005, electromyography ("EMG") showed "some chronic changes . . . in a left L5/S1, predominantly S1"; "no acute denervation . . . ."; and abnormal H-reflexes (R. 221). Dr. DeNunzio diagnosed a "left L5-S1 radiculopathy" and prescribed Percocet (R. 219).

Plaintiff presented to Dr. DeNunzio on December 15, 2005, for treatment for injuries sustained in an automobile accident on December 14, 2005. His left and right shoulder x-rays were normal (R. 227, 229). His cervical spine showed interspace narrowing and degenerative changes at C5-6 (R. 228). He was diagnosed with cervical strain and bilateral shoulder strain. He was prescribed Toradol, Percocet, and Flexeril (R. 217).

On December 20, 2005, Dr. DeNunzio examined Plaintiff, who appeared to be in "acute distress." He diagnosed cervical strain, bilateral shoulder strain, cephalgia, and degenerative cervical joint disease. He prescribed Flexeril and Percocet and referred Plaintiff to physical therapy (R. 218).

2

Through January 2006, Dr. DeNunzio treated Plaintiff for chronic back pain, neck pain, a cervical strain, and headaches. He was prescribed Percocet and Flexeril and instructed to participate in physical therapy (R. 216, 225, 232, 233). An MRI for severe headaches, dizziness, weakness, memory loss, and blurred vision, was positive for sinusitis (R. 231). A lumbar spine x-ray showed degenerative disc disease at L5/S1 with "some straightening of the upper lumbar spine" (R. 244).

On January 31, 2006, Dr. DeNunzio prescribed Oxycontin to Plaintiff for pain control (R. 230).

Plaintiff's February 7, 2006, MRI of his cervical spine showed multilevel spondylosis, right lateral "recess encroachment at the C5-6 level by spurs," and no focal disc herniation (R. 224, 238).

Plaintiff's August 12, 2006, lumbar MRI showed disc degeneration at L1/L2, with no focal protrusion or spinal stenosis; L5 disc degeneration with mild concentric bulge and a "small disc fragment in the left lateral recess"; Schmorl's node changes in L1 through L3 endplates; possible end plate edema between L5/S1; and facet arthritis (R. 236-37).

Plaintiff presented at Northwood Health Systems ("Northwood") on January 4, 2007, due to "exacerbation of psychiatric signs and symptoms." He reported suicidal ideations; he had no intent or attempts. He reported depression, anxiety, feelings of hopelessness and helplessness, impulsivity, withdrawal, poor judgment, poor concentration, crying, agitation, and feeling worthless. He stated he forced himself to eat. He experienced poor sleep. He stated his "life [was] pretty much in shambles." Plaintiff reported he had not had a history of psychiatric symptoms or suicidal ideations until he "began becoming severely depressed when his wife left him in November 2006." His primary care physician had prescribed Prozac, but he was not compliant in taking it. Plaintiff reported chronic pain due to his having been in a car accident and his having been burned over thirty (30) percent of his body (R. 250).

Upon examination, Plaintiff was fully oriented. His speech, appearance, thought content, and memory were within normal limits. He was withdrawn. Plaintiff stated he was being treated by a pain

3

specialist for his chronic pain in his neck, legs, back, and arms. He medicated with Flexeril and Vicodin (R. 251). Plaintiff was admitted to Northwood's crisis stabilization unit due to "elevated levels of psychiatric symptoms," which were suicidal ideations and "thoughts of jumping off the Moundsville bridge," depression, anxiety, poor judgment, impulsivity, poor appetite, impaired sleep, loss of interest in activities, and feelings of hopelessness, helplessness, and worthlessness (R 252). Plaintiff reported he had drunk alcohol for thirty (30) years (R. 253). Plaintiff reported he was not employed and he was "not looking" for employment. Plaintiff stated he was on probation for not paying child support (R. 255). It was found that Plaintiff had marked limitations in his ability to care for himself; complete activities of community living; function socially, interpersonally, or with his family; concentrate or perform tasks; and behave without impulse or danger (R. 256). Plaintiff was diagnosed with major depression, recurrent, severe, and without psychosis, and chronic pain. His GAF was listed as twenty-four (24) (R. 257).

On January 4, 2007, Plaintiff was transferred from the crisis unit at Northwood to the emergency department at Ohio Valley Medical Center for back, neck, and shoulder pain, and leg numbness. Upon examination, Plaintiff's neck was supple, slightly tender, and had normal range of motion. He had decreased flexion and positive straight leg raise, bilaterally. His upper extremities were normal. He was neurologically intact. Plaintiff reported he was "out of his pain medicine" or that "his sister had not brought his pain medication" to Northwood. Dr. Schreiber and Dr. Kovalic treated Plaintiff with Toradol. They informed Plaintiff they did not manage chronic pain in the emergency department and he would have to "get his own pain medications from his sister or have the psychiatrist . . . manage his chronic pain." Plaintiff returned to Northwood for continued inpatient treatment (R. 246-48).

It was noted at Northwood, on January 5, 2007, that Plaintiff was "upset, depressed, overwhelmed." His affect was labile; his speech and eye contact were normal. He was not suicidal or homicidal, and he had no delusions or hallucinations. He was prescribed Effexor (R. 270).

On January 7, 2007, a medical professional at Northwood found Plaintiff had increased insomnia, mood swings, and anxiety. He was irritable and angry. His appearance was appropriate, gait was normal, affect was blunted, mood was dysphoric, eye contact was normal, and speech was normal. He was fully oriented. He denied suicidal or homicidal ideations; he had no hallucinations or delusions. Plaintiff was prescribed Depakote as treatment for mood swings (R. 272).

On January 8, 2007, Plaintiff reported racing thoughts, sleeplessness, and anxiety. He was prescribed Seroquel "for thought." He had no mood swings and less anxiety. His appearance was appropriate, posture and gait were normal, motor activity was normal, affect was blunted, mood was anxious, and eye contact was normal. He had no suicidal or homicidal ideations; he had no hallucinations or delusions. He was fully oriented (R. 274).

Plaintiff was examined by Dr. Corder, of Northwood, on January 9, 2007. Plaintiff reported he was not sleeping well, was "still overwhelmed," but had "less depression." Plaintiff reported he remained "nervous" and had chronic pain. His appearance was appropriate; his posture and gait were normal; his motor activity was normal; his affect was blunted; his mood was euthymic; he was oriented as to person, place, time, and situation; his eye contact was normal; and his speech was normal. Plaintiff had no suicidal or homicidal plans; he had no hallucinations or delusions (R. 276). Dr. Corder noted Plaintiff reported he was "not doing well at all" because he was "stressed and overwhelmed about breakup with wife." He felt his life was "ruined" (R. 278).

Plaintiff was examined by Dr. DeNunzio on January 8, 2007, for chronic pain syndrome. He had not taken Percocet since January 4, 2007. Plaintiff reported right arm and leg pain. He was tired.

He had increased weakness. He was diagnosed with low back pain and prescribed Percocet, Flexeril, Nasonex, Celexa, and Restoril. He was referred to a neurosurgeon (R. 397).

On January 10, 2007, Plaintiff reported to a medical professional at Northwood that he had "good" sleep and he felt rested. He experienced chronic pain and "still some anxiety." Plaintiff attended group therapy sessions. Plaintiff's appearance was appropriate and posture, gait, eye contact, motor activity, and speech were normal. Plaintiff was oriented as to person, place, time, and situation. He was not suicidal or homicidal; he had no hallucinations or delusions (R. 280).

Plaintiff reported to a medical professional at Northwood that he had "thoughts of self harm" on January 11, 2007, when he woke. He stated he was "upset about not seeing wife & child." He was "easily upset" and had decreased concentration. Upon examination, Plaintiff's appearance was appropriate and posture, gait, eye contact, motor activity, and speech were normal. Plaintiff was oriented as to person, place, time, and situation. His affect was blunted, and his mood was depressed (R. 282). Plaintiff had no homicidal ideations, self neglect, self injury, hallucinations, delusions, paranoia, tangential thinking, loose associations, thought blocking, or mania. He was mildly suspicious and panicked. He had moderate symptoms of hostility, blunted affect, crying, high/low energy, changes in appetite, and changes in sleep pattern. Plaintiff's suicidal ideation, withdrawal, impulsivity, poor judgment, poor concentration, worthlessness, agitation, and loss of interest in activities were rated severe. Plaintiff had acute depression, anxiety, and feelings of hopelessness and helplessness. He stated he "seriously" thought about jumping off a building or bridge or "stuff[ing] [his] head through a window." Plaintiff stated he did not know what would happen if he were released from Northwood – he "might be alright" or he "might kill" himself (R. 284).

On January 12, 2007, Plaintiff reported that he was sleeping well and was less anxious. He was "concern[ed]" about "home problems." Plaintiff's dosage of Seroquel was increased. Upon

examination, Plaintiff's appearance was appropriate; posture, gait, motor activity, eye contact, and speech were normal; affect was blunted; and mood was anxious and depressed. Plaintiff was fully oriented. He had no suicidal or homicidal plans; he had no hallucinations or delusions (R. 286).

Plaintiff reported on January 13, 2007, that he may "be in jail soon," he was "still upset over" his separation from his wife, and "suicide would end it all." He was nervous, and was attending group therapy sessions. Plaintiff's appearance was appropriate; posture, gait, motor activity, and speech were normal; eye contact was fleeting; affect was blunted; mood was anxious and depressed. He was oriented as to time, person, place, and situation. He had no homicidal thoughts or plans; he had no delusions or hallucinations (R. 288).

On January 15, 2007, a medical professional at Northwood noted Plaintiff 's appearance was appropriate; his posture, gait, motor activity, eye contact, and speech were normal; his affect was blunted; and his mood was euthymic. He was oriented as to time, person, place, and situation. He had no suicidal or homicidal thoughts or plans; he had no delusions or hallucinations. Plaintiff reported he was overwhelmed "a little"; slept well; had a good appetite; and was in a good mood (R. 290). Plaintiff reported he thought the "'meds [were] working.'" He was not as depressed as he had been. Plaintiff reported he had decreased suicidal thoughts. He stated he was "'not really dwelling on them but before it was really, really bad." He stated he had increased hope and acceptance of possibility of he (sic) and wife ending marriage" (R. 292).

On January 16, 2007, Plaintiff told a medical professional at Northwood that he was having a "good day." He had no depression, had less anxiety, was "less overwhelmed," and slept well. His appearance was appropriate; his posture, gait, motor activity, eye contact, and speech were normal; his affect was appropriate; his mood was euthymic; he was oriented, times four (4). He had no homicidal or suicidal plans or thoughts; he had not delusions or hallucinations (R. 294).

7

Plaintiff reported to a medical professional at Northwood on January 17, 2007, that he had back pain, he slept well, was less depressed and "everything else was good." Plaintiff's appearance was appropriate; his posture, gait, motor activity, eye contact, and speech were normal; his affect was blunted; his mood was euthymic; he had no suicidal or homicidal thoughts or plans; he had no delusions or hallucinations (R. 296). Plaintiff stated he had started feeling better "last week," had a "relapse on 1/13/07," but had been "better . . . since then." He reported he felt "great" and did not "think he [could] get any better than this (maybe a little)." He accepted that his marriage "may be over" and was "facing it." He found that writing "things down" was "very helpful." It was found that Plaintiff had no homicidal ideations, hostility, violence, self neglect, self injury, hallucinations, delusions, paranoia, tangential thinking, loose associations, thought blocking, suspiciousness, blunted affect, crying, panic, mania, agitation, changes in appetite, or change in sleep pattern, which was "good." He had mild suicidal ideations, withdrawal, depression, anxiety, worthlessness, hopelessness, helplessness, high energy, loss of interest in activities, and concentration. Plaintiff had moderate impulsivity and judgment (R. 298).

Plaintiff informed a medical professional at Northwood on January 18, 2007, that he was "able to think about his problems"; had not "felt this good in at least 2 years"; "accepting that his marriage [was] probably over"; "ready to move on"; working to obtain a medical card for disability; worrying about child support and divorce issues; and "using tools discussed in group to maintain positive attitudes" (R. 300). Plaintiff's stabilization services were discontinued because the treatment objectives had been met (R. 303). Plaintiff was discharged from Northwood, medicated with Effexor, Depakote, Seroquel, and Lexapro, and instructed to continue with individual therapy (R. 302-03).

Plaintiff presented to Dr. Chandrasekhar on February 8, 2007, for testing for diabetes. Plaintiff reported he experienced neck pain, arm pain, constant bilateral arm numbness, low back pain with pain

radiating to both legs, and leg numbness. Plaintiff described his pain as sharp and burning. Upon examination, Dr. Chandrasekhar found Plaintiff's deep tendon reflexes were normal; his strength was 5/5. Plaintiff's ranges of motion were reduced; his straight leg raising test was positive, at forty (40) degrees. Dr. Chandrasekhar diagnosed degenerative joint disease of C5-6, radiculopathy, chronic L5-S1 radiculopathy, and chronic pain. Dr. Chandrasekhar ordered an EMG (R. 396).

Individual mental therapy and mental health drug treatment plans were created on February 16, 2007, at Northwood for Plaintiff(R. 304). Plaintiff stated he had minimal symptoms of anxiety; however, he experienced heightened anxiety due to his not having taken his medication for two (2) days. Plaintiff was instructed to participate in individual therapy, participate in group therapy, take medication, and undergo a psychiatric evaluation (R. 305-06, 312). Plaintiff denied any suicidal thoughts, but he stated he would "kill himself before going to jail" if he were sentenced to incarceration (R. 308, 312). Plaintiff stated he experienced "continued depressive symptoms related to relationship stressors with wife and legal problems" (R. 312).

Plaintiff participated in group therapy at Northwood on February 19, 2007. Plaintiff stated his "primary strategy for dealing with anxiety" was to "take walks" (R. 314). Plaintiff's anxiety was listed as "mild." Plaintiff stated his feelings of depression or thoughts of harming himself or others could "change at any time." He had "been working on . . . behaving himself by not drinking" (R. 315).

Plaintiff participated in individual therapy at Northwood on February 21, 2007. Plaintiff's anxiety was "mild." He was "very angry . . . and tearful . . . due to court issues" because of non-payment of child support, for which he "may be receiving jail time." Plaintiff stated he would "hurt himself so he" would not have to "do jail time." He was "afraid of being closed in small quarters." Plaintiff was instructed to repeat the phrase, "Everything will work out and be o.k." (R. 317).

Monica Smith, a nurse practitioner ("N.P.") at Northwood, completed a psychiatric evaluation of Plaintiff on February 21, 2007. Plaintiff stated that Seroquel, Effexor, Depakote, and Lexapro had helped his mood and depression improve, but he now experienced increased anger, irritability, depression, fleeting suicidal thoughts, anxiety, and mood swings. Plaintiff stated his father had been physically and mentally abusive to him when he was a child. Plaintiff "did very well" in school; however, he drank alcohol, smoked marijuana, and used cocaine "frequently" until the age of twenty-two (22) (R. 318). Plaintiff reported he had fallen off a ladder and had experienced burns over thirty (30) percent of his body ten (10) years earlier. He had last worked in 2006. He had chronic back and neck pain. He had been married twice. He had two (2) children with his first wife; he had one (1) child with his current wife, from whom he was separated; and he had a total of five (5) children with four (4) different women. He had been "incarcerated in Utah and West Virginia three to four times." He lived with his sister (R. 319).

Upon examination, Plaintiff was casually and appropriately dressed, clean, well groomed, alert, oriented, reserved, and guarded. He had no suicidal or homicidal ideations; he was not delusional; he was anxious. He answered questions appropriately; he "said nothing that was bizarre"; he made good eye contact; he was tearful when he spoke about his children. N.P. Smith diagnosed major depressive disorder, recurrent; chronic pain; and a GAF of thirty-five (35) (R. 319). N.P. Smith instructed Plaintiff to continue medicating with Effexor, Depakote, Lexapro, and Seroquel and recommended individual counseling and anger management (R. 319-20).

On February 28, 2007, Plaintiff informed N.P. Smith that his symptoms were improving with medication. He was casually, but appropriately, dressed; was alert and oriented; had clear speech; made eye contact; answered questions appropriately; said nothing that was bizarre or inappropriate;

was calm and cooperative. Plaintiff's mood was pleasant. N.P. Smith continued Plaintiff's prescriptions of Seroquel, Depakote, Lexapro, and Effexor (R. 321-22).

Plaintiff reported to Dr. Chandrasekhar on March 7, 2007, that he experienced constant neck pain, arm numbness, sharp pain in both legs, leg numbness, and leg weakness. Plaintiff stated he could not walk for extended periods of time. Plaintiff's straight leg raising test was positive at thirty (30) degrees; his range of motion and adduction were reduced. Plaintiff limped when he walked. He was diagnosed with depression, anxiety, mood changes, and degenerative joint disease and prescribed Ibuprofen (R. 395).

Plaintiff was admitted to the crisis unit at Northwood for crisis stabilization on March 11, 2007. He was found positive for "acute crisis levels of depression, anxiety, feelings of hopeless (sic) and helplessness, severe levels of suicidal ideations, withdrawal, impulsivity, poor judgement (sic), poor concentration, suspiciousness, feelings of worthlessness, agitation, low energy, loss of interest in activities, and moderate levels of blunted affect, crying, change in sleep pattern." Plaintiff reported he felt "like he [was] a 'burden to [his] family.'" Plaintiff reported his suicidal ideations had begun "mainly just this week." He stated if "they [threw him] in jail," he would "kill [himself] the first chance" he got. He stated his wife was "playing head games with him." He reported he would jump in the river or jump in front of a truck. Plaintiff stated that legal and marital problems exacerbated his symptoms. Plaintiff reported he was not eating or caring for himself. He experienced "constant pain" due to physical health issues (R. 323). It was noted Plaintiff had never had psychiatric inpatient care or partial hospitalization for mental conditions; he had received inpatient crisis stabilization, however. Plaintiff reported chronic bronchitis and chronic pain of his neck, legs, back, and arms. Plaintiff reported he was in an intensive care unit five (5) years earlier for burns over thirty (30) percent of his

body. Plaintiff stated he was being treated by a pain specialist. Plaintiff was oriented, times four (4), and he had normal speech, appearance, memory, and thought content. His sociability was withdrawn (R. 324). Plaintiff exhibited poor judgment, impulsivity, feelings of helplessness, feelings of hopelessness, feelings of worthlessness, feelings of being overwhelmed, crying, impaired sleep, and loss of interest in activities. Plaintiff was "extremely . . . troubled" by his problems (R. 325). Plaintiff reported he had consumed alcohol for thirty (30) years; he smoked (R. 326). Plaintiff was "quite a bit . . . troubled" by his separation from his wife of three (3) years (R. 327). Plaintiff was on probation for not paying child support; he was also awaiting a hearing for being a "fugitive from justice." Plaintiff stated he would "kill himself" if he were sentenced to jail when he appeared at his March 14, 2007, court hearing. The medical professional noted Plaintiff had marked limitations in his ability to care for himself; mild limitations in his activities of community living; marked limitations in his social, interpersonal, and family functioning; marked limitations in his concentration and task performance; and marked limitations in his behavior (maladaptive, dangerous and impulsive) (R.329). The diagnosis was major depression, recurrent, severe, but without psychosis; chronic pain; and GAF of 24 (R. 330). A fifteen (15) minute suicide observation plan was implemented (R. 334).

An initial psychiatric evaluation was completed on Plaintiff by a medical professional at Northwood on March 12, 2007. Plaintiff listed his presenting problems as "legal problems" and "problems [with] relationship." He stated he was overwhelmed, nervous, and upset. Plaintiff stated he "want[ed] to end it all." His appearance was appropriate; his posture and gait were normal; his motor activity was normal; his affect was blunted; his mood was depressed and labile; he was oriented, times four (4); and his speech and eye contact were normal. He was positive for suicidal ideations. He had no homicidal plans or intent; he had no delusions or hallucinations.(R. 337).

Plaintiff was evaluated on March 14, 2007, at Northwood relative to crisis stabilization. It was noted that Plaintiff was "very depressed." Plaintiff did not want to discuss his suicidal plans "right now." He needed to "wait till [he] [woke] up a little." Plaintiff's appearance, posture, gait, motor activity, and speech were normal. His affect was flat, and his mood was depressed. He avoided eye contact (R. 341). It was noted that Plaintiff was making "relevant . . . progress toward crisis resolution." He continued to require medical supervision and monitoring (R. 342). Plaintiff's GAF was listed as twenty-four (24). He had no homicidal ideations, hostility behavior, violent behavior, self-injury behavior, hallucinations, delusions, paranoia, tangential thinking, loose associations, thought blocking, panic, or mania. Plaintiff had mild crying. Plaintiff had moderate self-neglect behavior, blunted affect, change in appetite, and change in sleep pattern. Plaintiff had severe suicidal ideations, withdrawal, impulsivity, poor judgment, poor concentration, suspiciousness, feelings of worthlessness, agitation, low energy, and loss of interest in activities. Plaintiff had acute depression, anxiety, and feelings of hopelessness and helplessness (R. 343). The medical professional who completed the evaluation found Plaintiff needed to be evaluated by a psychiatrist (R. 344).

On the 15th of March, 2007, Plaintiff told a medical professional at Northwood that he was "doing better than yesterday." He experienced "severe depression & anger towards his wife" due to his having "received a letter from his lawyer concerning the law suit that his wife has filed against him." He had "passive thoughts of wanting to harm himself." Plaintiff's dosage of Effexor was increased. Plaintiff's appearance, posture, gait, motor activity, eye contact, and speech were normal. His affect was blunted; his mood was depressed. He had no homicidal or suicidal plans; he had no delusions or hallucinations (R. 345). It was noted Plaintiff was making "relevant . . . progress toward crisis resolution" (R. 346).

Plaintiff was evaluated for crisis stabilization at Northwood on March 16, 2007. Plaintiff felt a "little better," but he was "still overwhelmed." His appearance, posture, gait, motor activity, eye contact and speech were normal. His affect was blunted; his mood was depressed. He was oriented, times four (4). He had no suicidal or homicidal thoughts; he had no delusions or hallucinations (R. 347). It was noted that Plaintiff was making "relevant . . . progress toward crisis resolution" (R. 348). Plaintiff had no homicidal ideations, violent behavior, self-neglect, self-injury behavior, paranoia, tangential thinking, loose associations, thought blocking, crying, panic, or mania. Plaintiff had mild hostility. Plaintiff had moderate poor concentration, suspiciousness, low energy, agitation, change in appetite, and change in sleep pattern. Plaintiff had moderate suicidal ideations; withdrawal; impulsivity; poor judgment; depression; anxiety; feelings of worthlessness, helplessness, and hopelessness; and loss of interest in activities. Plaintiff informed the medical professional that he had less anger. He was "thinking of moving on (from marriage)" (R. 349).

Plaintiff was evaluated on March 17, 2007, by a medical professional at Northwood. Plaintiff stated he was having a "fair day." He had no suicidal thoughts. Plaintiff's dosages of Seroquel and Depakote were increased. His appearance, posture, gait, motor activity, eye contact, and speech were normal. Plaintiff was oriented, times four (4). His affect was blunted; his mood was depressed. He had no homicidal thoughts; he had no delusions or hallucinations (R. 351). It was noted that Plaintiff was making "relevant . . . progress toward crisis resolution" (R. 352).

On March 18, 2007, Plaintiff was evaluated by a medical professional at Northwood. He stated he felt "better." He had "passive suicidal thoughts" and mild anger. His appearance, posture, gait, motor activity, eye contact, and speech were normal. His affect was appropriate; his mood was

euthymic. He was oriented, times four (4). He had no suicidal or homicidal plans, delusions, or hallucinations. He had made "relevant . . . progress toward crisis resolution" (R. 354).

Plaintiff was interviewed on March 19, 2007, by a medical professional at Northwood relative to crisis stabilization. He appeared "quite tense." He did not make eye contact. He had "passive thoughts" of hurting himself. He slept well. Plaintiff's appearance, posture, gait, motor activity, and speech were normal. His mood was depressed; his affect was appropriate. He had no homicidal thoughts; he had no hallucinations or delusions (R. 355). It was noted that Plaintiff had made "relevant . . . progress toward crisis resolution" (R. 356).

On March 20, 2007, Plaintiff reported to a medical professional at Northwood that he was doing "much better." He had no thoughts of self harm. He stated the "group & friends he made" at Northwood "have helped him & he ha[d] begun keeping a journal w/his thoughts." Plaintiff's appearance, posture, gait, motor activity, and speech were normal. He was oriented, times four (4). His eye contact was fleeting, affect was flat, and mood was depressed (R. 357). He had made "relevant . . . progress toward crisis resolution" (R. 358). Plaintiff had no homicidal ideations, violent thoughts, self-neglect behavior, self-injury behavior, hallucinations, delusions, paranoia, tangential thinking, loose associations, thought blocking, crying, panic, or mania. He had mild hostility, blunted affect, change in appetite, and change in sleep pattern. Plaintiff had moderate suicidal ideations at night, withdrawal, poor concentration, suspiciousness, agitation, energy, and loss of interest in activities. Plaintiff had severe impulsivity, poor judgment, depression, anxiety, feelings of worthlessness, feelings of hopelessness, and feelings of helplessness. His GAF was twenty-eight (28) (R. 359).

A psychiatric review was completed on Plaintiff by a medical professional at Northwood on March 21, 2007. He felt "down" and had no energy. He had less anxiety and was restless. His

appearance, posture, gait, motor activity, eye contact, and speech were normal. His affect was blunted. His mood was depressed. Plaintiff had no suicidal or homicidal thoughts; he had no delusions or hallucinations. He was oriented, times four (4) (R. 361). It was noted that Plaintiff had made "relevant . . . progress toward crisis resolution" (R. 362).

On March 22, 2007, Plaintiff told the medical professional at Northwood that he was "very angry." He had received a letter "pertaining to court & appearances." He had mood swings. He stated he was "so depressed" about his life, "that he thinks of how to kill himself." He stated he was "not afraid to die" and would "rather die than go to jail" (R. 363). Plaintiff had increased agitation, depression, and anger. He had isolated himself in his bedroom at Northwood. He had racing thoughts. His GAF was twenty-seven (27) (R. 365). Plaintiffs appearance, posture, gait, motor activity, and speech were normal. Plaintiff's eye contact was fleeting. He was oriented, times four (4). His affect was blunted and mood was depressed (R. 363).

On March 23, 2007, Plaintiff informed a medical professional at Northwood that he was restless and overwhelmed. He slept well and had a good appetite. His depression became worse in the afternoon. His appearance, posture, gait, motor activity, eye contact, and speech were normal. His affect was blunted. His mood was anxious. Plaintiff was oriented, times four (4). He had no suicidal or homicidal thoughts; he had no delusions or hallucinations (R. 367). It was noted that Plaintiff had made "relevant . . . progress toward crisis resolution" (R. 368).

Dr. Chandrasekhar completed a physical examination of Plaintiff on April 5, 2007. Plaintiff complained of constant back pain and increased leg and neck pain. Plaintiff reported the dose of Percocet was "not helping pain." He wanted the dosage increased. Upon examination, Dr. Chandrasekhar found Plaintiff's eyes, ears, nose, throat, neck, cardiovascular, abdomen, and

neurologic examinations were normal. His strength was 5/5. Plaintiff was oriented, times three (3). His mood, insight, and speech were normal. Dr. Chandrasekhar diagnosed anxiety, depression, and degenerative joint disease. Dr. Chandrasekhar increased Plaintiff's dosage of Percocet (R. 394).

It was noted on April 12, 2007, that Plaintiff's care at Northwood was terminated due to his incarceration. It was noted that Plaintiff had received crisis stabilization in January, 2007, and then failed to return for psychiatric evaluation later as instructed. He then received crisis stabilization "services in March due to increased symptoms. Mental Hygiene papers were filed." Plaintiff received "correspondence from his attorney in a criminal action in South West (sic) Ohio and subsequently returned there to address legal issues that concern a felony child support non-payment issue." Plaintiff was in jail in Warren County, Ohio, awaiting sentencing on those charges, which was expected to be a nine (9) month sentence (R. 370).

On December 10, 2007 Plaintiff was admitted to the Northwood crisis unit for "increased symptoms including acute crisis levels of depression; severe levels of suicidal ideations, hostility, impulsivity, poor judgement (sic), poor concentration, suspiciousness, feelings of worthlessness, helplessness and hopelessness, agitation, low energy, loss of interest in activities; and moderate levels of blunted affect, change in sleep pattern" (R. 371). Plaintiff reported auditory and visual hallucinations. He had "heard his name being called and [saw] spots" (R. 373). Plaintiff reported he had been released from prison on December 2, 2007, after having been incarcerated for eight (8) months. While in prison, Plaintiff was medicated with Risperdal, Buspar, Effexor, Depakote, and Remeron. Plaintiff stated that these medications were "ineffective at treating his symptoms." Plaintiff stated he thought of suicide every day for more than one (1) year. Plaintiff stated that when he was first incarcerated, he attempted suicide "by sharpening an id badge and cutting his wrist." Plaintiff

currently had a plan to cut his wrist, jump off a bridge, or shoot himself. Plaintiff had no homicidal ideations but he had "aggressive thoughts directed at 'nobody in particular'" (R. 371). Plaintiff was oriented, times four (4); his speech, thought content, sociability, and memory were within normal limits. He was disheveled (R. 372). Plaintiff's alcohol use had been moderate during the past thirty (30) days (R. 374). Plaintiff stated he could not "ever" get his "estranged wife out of his mind" (R. 375). Plaintiff stated his sister supported him. He could not work due to physical pain. Plaintiff was approved for Medicaid; he had filed an application for Social Security disability (R. 376)[1]. Plaintiff had moderate limitations in self care; mild limitations in activities of community living; moderate limitations in his social, interpersonal and family functioning; moderate limitations in concentration and task performance; and moderate levels of maladaptive, dangerous, or impulsive behaviors (R. 377). Plaintiff was diagnosed with major depression, recurrent, severe and without psychosis; alcohol dependence; chronic pain; and a GAF of twenty-four (24) (R. 378). Plaintiff was monitored every fifteen (15) minutes for suicide (R. 382).

On December 11, 2007, Plaintiff told a medical professional at Northwood that he was depressed, had hallucinations, and difficulty sleeping, and had increased appetite. Plaintiff's appearance, posture, gait, motor activity, and speech were normal. His affect was flat; his mood was depressed. He was oriented, times four (4). He was positive for suicidal thoughts and hallucinations. He was negative for homicidal thoughts and delusions (R. 389). It was noted that Plaintiff had made "relevant . . . progress toward crisis resolution" (R. 390).

---

[1]There is no record of Plaintiff having filed an application for Social Security prior to 2008. When asked at the administrative hearing why he had not filed sooner, he replied, "he thought he had," but forgot. His mother and sister convinced him to apply in 2008.

Plaintiff's treatment at the Northwood crisis unit was discontinued because he was admitted to the Ohio Valley Medical Center on December 12, 2007 (R. 392).

Plaintiff was evaluated by N.P. Smith, at Northwood, on December 17, 2007. N.P. Smith found Plaintiff was appropriately dressed; he was alert and oriented; he maintained eye contact; his speech was clear; he did not act in a "bizarre or inappropriate" manner; his mood was anxious. Plaintiff stated he drank alcohol several times per week "until he [got] drunk." He had no suicidal or homicidal thoughts. He reported "high anxiety" and "mood swings." Plaintiff stated he was irritable, anxious, and depressed. Plaintiff's prescription for Remeron was discontinued. His dosages of Effexor and Depakote were increased. Plaintiff was instructed to return in two (2) weeks (R. 393).

A doctor examined Plaintiff on December 21, 2007. Plaintiff was positive for lumbar tenderness and spasm. He was diagnosed with L5/S1 radiculopathy, degenerative joint disease, and acute or chronic sinusitis. He was prescribed Ibuprofen, Percocet, Flexeril, and Nasonex (R. 245).

Plaintiff's January 15, 2008, EMG showed "mild to moderate right carpal tunnel syndrome. Possible chronic L5 radiculopathy in right lower extremity" (R. 398).

Plaintiff presented to N.P. Smith on January 15, 2008, for his scheduled appointment. He stated he had mood swings, depression, paranoia, insomnia, racing thoughts, and fleeting suicidal ideations without intent. Plaintiff stated he had "[n]oticed no improvement" with medication treatment. Plaintiff stated he had consumed less alcohol than he had been consuming. Plaintiff was cooperative; his activity level was normal; his speech was normal; his affect was blunted; he was oriented to person, place and time. N.P. Smith found Plaintiff was "having difficulty." She ordered that Plaintiff taper then discontinue Risperdal; she prescribed Invega and Trazadone; she continued Plaintiff's prescriptions for Buspar, Depakote, and Effexor (R. 417).

Plaintiff reported to Dr. Chandrasekhar on January 21, 2008, that he "want[ed] to switch to Roxicodone 15 from Percocet." Plaintiff's strength was 5/5; his insight and speech were normal. He was diagnosed with degenerative disc disease, anxiety, and radiculopathy. His straight leg raising test was sixty (60) degrees. He was prescribed Percocet (R. 409, 478).

On January 24, 2008, Plaintiff participated in individual therapy at Northwood. Therapist Weitzel noted Plaintiff had not had a session with her for a "very long time" due to his having been incarcerated. Therapist Weitzel found Plaintiff's anxiety was "high." Plaintiff stated his medications had "got[ten] all mixed up in jail and he [had] not been handling situations very well." Plaintiff's speech was rapid, mood was angry, and affect was blunted. Plaintiff denied suicidal or violent ideations. He had difficulty sitting still. He reported he had to "fend[] for his life" in prison; he experienced "flashbacks today about this time spent there." Plaintiff stated he was "getting slightly better but not much." Therapist Weitzel instructed Plaintiff to "use positive self talk to help decrease anxiety." Plaintiff reported nightmares with the "major theme[s]" of "anger and being lost." Plaintiff felt his "failed relationship between him and his wife" could have caused the nightmares (R. 418).

On January 29, 2008, Plaintiff presented to N.P. Smith for pharmacological management. He reported "no difficulties." Plaintiff had "problems with sleep"; his appetite was good, energy level was normal, activity level was normal, speech was normal, and mood was normal. Plaintiff was well groomed, cooperative, and was oriented to person, place and time. Plaintiff reported no "problems with medications." He "noticed improvement in mood and irritability." He stated he had been "doing well." He had decreased his alcohol intake. N.P. noted Plaintiff was "in good spirits today." She continued Plaintiff's prescriptions for his current medications, which included Invega, Trazadone, Effexor, Depakote, Buspar, and Restoral (R. 420).

Plaintiff participated in individual therapy with Therapist Weitzel on February 11, 2008. He reported he was "very confused about the way he [was] feeling." He stated he took "a lot of medicines" but did not feel "they work because he [did] not feel at ease or comfortable with himself." He often felt depressed, angry, confused, or anxious. He had "violent nightmares" and "flashbacks from being in jail." Therapist Weitzel discussed "coping tools" with Plaintiff. He wrote in a journal (R. 421).

Plaintiff reported to Therapist Weitzel at his February 19, 2008, individual therapy session that he was "not . . . able to effectively manage his symptoms of anger, depression, paranoia and falling asleep." He was "very depressed because he [was] not where he want[ed] to be in life," he misse[d] his soon to be ex wife," "his life suck[ed] because he ha[d] no income, he live[d] with his parents and he [felt] ashamed to be receiving food stamps." He stated the medication was not working because he "[felt] bad and crazy all the time" and he did not "seem to be getting better." Plaintiff reported he fed horses, drew, and wrote in a journal (R. 424).

Plaintiff reported to N.P. Smith on February 19, 2008, that he felt irritable, anxious, and depressed. Plaintiff reported he had mood swings, cried, had lack of energy, had no motivation, had insomnia, and had passive suicidal thoughts without plan or intent. N.P. Smith noted Plaintiff was cooperative and well groomed. His speech and activity level were normal. His affect was labile. He was oriented as to person, place, and time. She prescribed Valproic, Invega, Trazadone, Effexor, Depakote, Buspar, Restoril, and Lamictal (R. 423).

Plaintiff reported to Dr. Chandrasekhar on February 21, 2008, that he smoked one and one-half (1 ½) packages of cigarettes per day. Dr. Chandrasekhar diagnosed right carpal tunnel syndrome, based on the January 15, 2008, EMG results, L5 radiculopathy, degenerative joint disease, and anxiety and depression. Medication was prescribed (R. 408, 477).

On February 26, 2008, Plaintiff reported to Therapist Weitzel that he had increased panic attacks. He was paranoid and felt "out of balance." Plaintiff stated when he thought of his last failed relationship, he felt sad (R. 426).

On February 26, 2008, Plaintiff reported to N.P. Smith that he was "feeling better." He was "still having some problems but depression, racing thoughts, paranoia and anxiety improved from last" week. His speech was normal; his affect was normal; his activity level was normal; his appearance was unremarkable; he was cooperative; and he was oriented to person, place and time. N.P. Smith noted that Plaintiff was making progress. He medicated with Valproic, Invega, Trazadone, Effexor, Depakote, Buspar, Restoril, and Lamictal (R. 425).

It was noted by a medical professional at Northwood, on March 4, 2008, that Plaintiff had moderate anxiety and moderate to severe depression symptoms. Plaintiff did not "like having to rely on his parents for support." Plaintiff reported he kept "himself busy by playing cards with friends and family," feeding horses, drawing, and bringing firewood into the house. Plaintiff reported nightmares; he slept between three (3) and five (5) hours per night. He had mild suicidal ideations with no intent. He drank three (3) times per month. It was recommended that Plaintiff participate in pharmacological management, individual professional therapy, and supportive counseling (R. 435).

At a March 10, 2008, individual therapy session with Therapist Weitzel, Plaintiff stated he had suicidal ideations daily but he "would not act upon them." Plaintiff stated he had tried to harm himself in the past. Plaintiff refused treatment at the Northwood crisis stabilization unit. Therapist Weitzel noted Plaintiff was making progress in identifying negative and irrational thoughts in therapy, but he did not do "well on his own." Therapist Weitzel suggested Plaintiff "check[] himself into an inpatient facility" because he was taking a large amount of medicine, was not feeling better, may need further

assessment, did not associate with others often, and had suicidal ideations. Plaintiff informed Therapist Weitzel that he had been cutting himself since he was a young child. Plaintiff stated when he cut himself, he felt better (R. 438).

On March 10, 2008, Plaintiff reported to N.P. Smith that he felt depressed and anxious. He had mood swings, had insomnia, and was irritable. He reported a passive suicidal ideation the previous day but had no plan or intent. N.P. Smith found Plaintiff was cooperative; his appearance was unremarkable; his activity level was normal; his speech was normal; his affect was blunted; he was oriented as to person, place, and time. N.P. Smith noted Plaintiff was "having difficulty." She prescribed Valproic, Invega, Trazadone, Effexor, Depakote, Buspar, Restoril, and Lamictal (R. 437).

Plaintiff told N.P. Smith that he had "no difficulties" on March 17, 2008. His appetite was good; his energy level, mood, activity level, and speech were normal. He was oriented as to person, place, and time. His appearance was unremarkable. He had no "problems" with medications. He was cooperative. He had "fleeting" thoughts of suicide, but no plan or ideation. N.P. Smith found Plaintiff was "making progress." He medicated with Valproic, Invega, Trazadone, Effexor, Depakote, Buspar, Restoril, and Lamictal (R. 440).

Plaintiff participated in individual therapy on March 18, 2008, with Therapist Weitzel. Plaintiff reported he was "having a better day and that he had a good day yesterday." He stated his good days occurred when he did not have any thoughts of harming himself or mood swings. Plaintiff stated that his "parents and children are the two biggest reasons" that "stop[ped] him from trying to commit suicide." Plaintiff "seem[ed] very proud of himself and what he has accomplished throughout his life." Therapist Weitzel found Plaintiff had not reported "more than mild anxiety on the MSE scale

for anxiety for 12 consecutive weeks." Plaintiff practiced relaxation techniques at home; he enjoyed drawing and writing in his journal (R. 441).

Ronald L. Rielly, Ed.D., a licensed psychologist at Northwood, completed a psychological evaluation of Plaintiff on March 20, 2008. Plaintiff stated he had "lost everything" he owned. He was "devastated" when his wife left him. Plaintiff stated a law suit relative to a 2005 automobile accident was still pending. Plaintiff reported he was in constant pain and could not concentrate (R. 442). Plaintiff lived with his parents and had no income. Plaintiff stated his relationships with his siblings were "good." Plaintiff reported he had five (5) children and had been married twice. Plaintiff graduated from high school; he did not repeat any classes; his school performance was average. Plaintiff's work history included working construction jobs and in a pizza shop (R. 443). Plaintiff reported he had been in prison two (2) times, once in 1983 for two (2) years for manufacturing and distributing marijuana and once in 2007 for failure to pay child support. Plaintiff reported he fought while in prison. Plaintiff stated he had first used drugs when he was ten (10) years old and alcohol when he was thirteen (13) years old. Plaintiff used marijuana, hallucinogens, cocaine, and crystal methamphetamine. Plaintiff had not used drugs for the past three (3) years. Plaintiff drank alcohol three (3) days per month and became intoxicated "a few times a month." Plaintiff stated he had suffered construction-work injuries, some of them head injuries; had seven (7) automobile accidents; and had been burned over thirty (30) percent of his body in an automobile accident (R. 444).

Upon examination, Psychologist Rielly found Plaintiff was not confused or disoriented; he maintained adequate attention and concentration throughout the examination; his memory and recall for recent events were intact; and his remote memory was unimpaired (R. 444). Plaintiff had an adequate fund of information; his overall intellectual functioning was average. Plaintiff's thought

24

process and thought content were normal. His insight and judgment were adequate. Plaintiff's mood and affect were appropriate. His appearance was normal (R. 445). Psychologist Rielly administered the Millon Clinical Multiaxial Inventory - III to Plaintiff. His results "suggest[ed] feelings of self-alienation and a very negative self-image" and "indicate[d] the probable presence of at least one moderate clinical symptom disorder and a severe personality disturbance" (R. 446). Plaintiff's scores showed "elevations" in scales for depressive personality disorder and borderline personality disorder (R. 447). Plaintiff's scores showed "elevations" in the scales of anxiety disorder, drug dependance, post traumatic stress disorder, and dysthymia (R. 448). Plaintiff's score of thirty-eight (38) on the Beck Depression Inventory - II showed severe depression. Psychologist Rielly's diagnostic impression was as follows: Axis I - major depression, recurrent and severe; alcohol dependence; Axis II - no diagnosis; Axis III - chronic pain; Axis V; global assessment of functioning forty-three (43) (R. 449). Therapist Rielly recommended that Plaintiff continue his current psychological services, which included individual therapy. Plaintiff should consider participating in anger group therapy and obtaining health care to "assess symptoms and needs on an ongoing basis, (sic) and to coordinate services" (R. 450).

On March 21, 2008, Plaintiff presented to Dr. Chandrasekhar with complaints of L1 radiculopathy and right carpal tunnel syndrome. Dr. Chandrasekhar discontinued Plaintiff's prescription of Flexeril. He diagnosed degenerative joint disease and anxiety (R. 407).

On March 31, 2008, Plaintiff told N.P. Smith that he was "having no difficulties." His appetite was good and energy level was normal. He had "minor mood swings." N.P. Smith found Plaintiff was "making progress." Plaintiff was prescribed Valproic, Invega, Trazadone, Effexor, Depakote, Buspar, Restoril, and Lamictal (R. 451).

Plaintiff participated in individual therapy on April 7, 2008, with Therapist Weitzel. Plaintiff reported he was "doing better overall with his 'crazy' thinking but he still [felt] depressed." He had nightmares. He had suicidal thoughts daily but would not act on them "because of his children and family." Plaintiff reported he had increased thoughts of cutting himself. He had no acute depression for the previous thirty-one (31) days (R. 452).

Plaintiff presented to N.P. Smith on April 21, 2008, for medication management. His mood was normal and "stabilizing." He had less frequent suicidal ideations. He had been drinking approximately one (1) liter of alcohol several times a week. N.P. found Plaintiff was cooperative; his appearance was unremarkable; his activity level was normal; his speech and affect were normal; and he was oriented as to person, place and time. Plaintiff was instructed "about alcohol intake" and to get lab work done so he could continue medication. He was prescribed Valproic, Invega, Trazadone, Effexor, Buspar, Restoril, and Lamictal (R. 453).

Plaintiff presented to N.P. Smith on May 12, 2008, for medication management. He felt depressed. He reported he had good and bad days. He reduced his alcohol intake. He had mood swings, was irritable, was depressed, and had fleeting thoughts of suicide. His affect was blunted. He had no psychosis. His activity level and speech were normal. He was oriented as to person, place, and time. He was cooperative and his appearance was unremarkable. N.P. Smith diagnosed depression and mood swings. She prescribed Valproic, Invega, Trazadone, Effexor, Lamictal, Buspar, and Restoril (R. 454).

Plaintiff presented to Dr. Chandrasekhar on May 21, 2008, with complaints of neck and back pain. Plaintiff's examination was normal except for decreased range of motion. Dr. Chandrasekhar diagnosed degenerative joint disease and anxiety (R. 406, 475).

On May 27, 2008, Plaintiff presented to N.P. Smith for medication management. He reported he was not sleeping well, had a good appetite, had a normal energy level, and had mood swings. Plaintiff stated his depression had improved. He consumed alcohol two (2) or three (3) times per week. He was cooperative, his appearance was unremarkable, his activity level and speech were normal, his affect was blunted, and he was oriented. There was no indication that he would harm himself. N.P. Smith prescribed Invega, Trazadone, Effexor, Lamictal, Buspar, and Restoril. N.P. Smith ordered blood work for Plaintiff (R. 455).

On June 5, 2008, Plaintiff participated in individual therapy with Therapist Weitzel. He stated he had not regularly attended individual therapy sessions because he had not felt well. Plaintiff reported he had good days and bad days. He was depressed and had racing thoughts. Therapist Weitzel found Plaintiff was making "slow but steady" progress (R. 456).

Plaintiff reported to N. P. Smith on June 10, 2008, for medication management. He stated he was sleeping well, felt irritable, had mood swings, was easily angered, and felt depressed but not suicidal. He consumed several alcoholic drinks weekly. His speech and activity level were normal. His affect was blunted. He was oriented. He was not at risk to harm himself. N.P. Smith prescribed Invega, Trazadone, Effexor, Lamictal, Buspar, Restoral, and Vistaril and ordered blood work (R. 457).

Plaintiff presented to N.P. Smith on June 17, 2008, for medication management. He reported he was "having no difficulties." He slept better, was short tempered, and was irritable. His suicidal thoughts were diminishing. His racing thoughts had improved; his mood was better; he had not been consuming alcohol; his speech and activity level were normal; he was oriented; and he was cooperative. N.P. Smith found Plaintiff was making progress. She prescribed Invega, Trazadone, Effexor, Lamictal, Buspar, Restoril, and Vistaril (R. 458).

On July 17, 2008, Plaintiff reported to N.P. Smith for medication management. He stated he was having difficulty falling and staying asleep. His appetite was good; he was irritable; he had fewer mood swings; he became angry easily; and he had consumed less alcohol. Plaintiff reported that, "overall," he was "feeling better than he ha[d] for some time." He was "active - going places and doing things." He was cooperative and well groomed. His activity level, speech, and affect were normal. He was oriented to person, place, and time. He had no hallucinations. He was not a danger to himself. N.P. Smith found Plaintiff had no acute symptoms and prescribed Invega, Trazadone, Effexor, Lamictal, Buspar, Restoril, and Vistaril. Plaintiff had not complied with her order to have his blood work done; she again ordered him to do so (R. 459).

Dr. Chandrasekhar removed stitches from Plaintiff's hand on July 17, 2008. He discontinued Plaintiff's prescription of Percocet; he prescribed Roxicodone (R. 405, 474).

Plaintiff against presented to N.P. Smith on August 12, 2008, for medication management. He had not yet had his blood work done; she instructed him to do that. He reported he was not sleeping well. He felt irritable. His depression had worsened. He had had fleeting suicidal ideations with no plan or intent because "he would be afraid to do so." Plaintiff reported his brother had "noticed" he was more irritable and meaner. He had no hallucinations and mild paranoia. He had mild mood swings and anxiety. N.P. Smith found Plaintiff was cooperative, his appearance was unremarkable, his activity level was normal, his speech was normal, and his affect was blunted. He was oriented. N.P. Smith found Plaintiff was depressed. She prescribed Invega, Trazadone, Lamictal, Effexor, Buspar, Cymbalta, Restoril, and Vistaril (R. 460).

Plaintiff presented to N.P. Smith on September 8, 2008, for medication management. He stated he was "having no difficulties." He was not sleeping well. His mood was normal. Plaintiff stated he

was "doing better" and that he had "been able to resume visitation" with his daughter, which "improve[d] his mood." He had attempted to drink less alcohol. He had not had any suicidal ideations. He was cooperative. His appearance was unremarkable. His activity level and speech were normal. His affect was blunted. He was oriented. He had no hallucinations. N.P. Smith prescribed Invega, Trazadone, Cymbalta, Lamictal, Buspar, Vistaril, and Restoril. Plaintiff was instructed to have his blood work done (R. 461).

Plaintiff presented to Dr. Chandrasekhar on September 16, 2008, with reports of increased back pain due to his having played with his nephew. Dr. Chandrasekhar refilled Plaintiff's prescription for Roxicodone and instructed him to not "play[] horse back" (R. 404, 473).

Plaintiff presented to Dr. Corder and Physician Assistant ("P.A.") Sempirek, at Northwood, for medication management on September 24, 2008. Dr. Corder found "no acute symptoms." Plaintiff stated he had difficulty falling and staying asleep. He denied any mania symptoms. He felt depressed. He had "no problems" with medication and realized "response" therefrom. He was not "having exaggerated reations (sic) to his stressor." He had moderate depressive mood; he felt "safe within himself." Plaintiff was cooperative, his appearance was unremarkable, his speech and activity level were normal, his affect was appropriate, and he was oriented. He had no hallucinations and was not a risk to himself or others. Dr. Corder ordered Plaintiff to continue taking his medications and prescribed Invega, Trazadone, Cymbalta, Lamictal, Buspar, Vistaril, and Restoril (R. 462).

Plaintiff presented to N.P. Smith on November 17, 2008, for medication management. He stated he had difficulty falling and staying asleep. His energy level was normal. He was depressed. He had not consumed alcohol in the past six (6) weeks. He had a suicidal ideation "a couple" weeks ago but "nothing recent." He had difficulty with his living arrangement and was staying with his

brother. He reported mild paranoia "at times." He was cooperative, his appearance was unremarkable, his activity level was normal, his speech was brief, his affect was flat, and he was oriented. He denied hallucinations. He was not at risk to be of harm to himself or others. N.P. Smith found Plaintiff was having "situational difficulties." She prescribed Invega, Trazadone, Cymbalta, Lamictal, Buspar, Vistaril, and Restoril (R. 463).

Plaintiff's November 20, 2008, lumbosacral spine x-ray showed interspace narrowing at L1-2, L2-3, and L5-S1. Schmorl's nodes and small spurs were present (R. 411, 883).

On December 8, 2008, Plaintiff reported to N.P. Smith for medication management. He stated he was not sleeping well. He felt depressed. He had no "problems" with medications. He had suicidal thoughts daily, but no intent or attempts. He had fleeting thoughts about cutting his wrists. He had not consumed alcohol in two (2) months. He reported that, "overall," he felt better. He had no hallucinations but felt paranoid at times. He had no racing thoughts. He was cooperative, his appearance was unremarkable, his activity level was normal, his speech was focused, his affect was normal, and he was oriented. N.P. Smith prescribed Invega, Trazadone, Cymbalta, Lamictal, Buspar, Vistaril, and Restoril (R. 464).

Dr. Chandrasekhar completed a physical examination of Plaintiff on December 12, 2008. His examination was normal, except for decreased range of motion and straight leg raising test of sixty (60) degrees. He was diagnosed with anxiety, degenerative joint disease, carpal tunnel syndrome, Schmorl's nodes, and L5-S1 radiculopathy. Dr. Chandrasekhar prescribed Roxicodone (R. 472).

On December 12, 2008, Dr. Chandrasekhar completed a questionnaire relative to Plaintiff's condition. Dr. Chandrasekhar listed Plaintiff's diagnoses as L5 radiculopathy, Schmorl's nodes at L1-L3, and carpal tunnel syndrome. Dr. Chandrasekhar found Plaintiff's condition was fair. Dr.

30

Chandrasekhar listed Plaintiff's symptoms as low back pain, positive straight leg raising test at forty (40) degrees, pain in his leg, reduced range of motion, and tender lumbar area. Dr. Chandrasekhar listed "pain in lumbar spine" as the nature, location, frequency, precipitating factor, and severity of Plaintiff's pain. Dr. Chandrasekhar listed "[p]ain worse [when] standing, bending, sitting for long periods" and "worse" when lifting or pushing and "narrowing L1-2 L2-L3 L5-S1 spurs, Schmorl's nodes" as the clinical findings and objective signs that support his diagnoses and opinions. Dr. Chandrasekhar did not list any treatment or responses thereto which affected Plaintiff's ability to work. Dr. Chandrasekhar found Plaintiff's impairments lasted or would last for twelve (12) months. He opined that Plaintiff was not a malingerer; and emotional factors (depression and anxiety) contributed to the severity of Plaintiff's symptoms and ability to function (R. 468). Dr. Chandrasekhar noted Plaintiff was in constant pain. He opined Plaintiff could tolerate moderate work stress but offered no support for this finding. Dr. Chandrasekhar found Plaintiff could walk for one (1) or two (2) blocks; could sit for twenty (20) minutes at a time; could stand for ten (10) minutes at a time; and could sit, stand, and walk for less than two (2) hours in an eight (8) hour workday. Dr. Chandrasekhar found Plaintiff did not need to walk during an eight (8) hour workday. Then Dr. Chandrasekhar found that Plaintiff needed to walk every twenty (20) minutes for five (5) minutes. He opined Plaintiff "can't work 8hr. work day" (R. 469). Dr. Chandrasekhar found Plaintiff needed to shift positions at will and needed to take unscheduled breaks every fifteen (15) to twenty (20) minutes. Plaintiff would then need to rest "every 10 minutes" before returning to work. Plaintiff did not need to elevate his legs. Dr. Chandrasekhar found Plaintiff should never lift fifty (50) pounds but could occasionally lift twenty (20), ten (10), and less than ten (10) pounds. Plaintiff did not need to use a cane or assistive device for walking. Dr. Chandrasekhar found Plaintiff had significant limitations in repetitive reaching,

handling or fingering. Specifically, Plaintiff could, during an eight (8) hour workday, use his right hand twenty-five (25) percent of the time to turn, grasp, and twist objects; use his left hand fifty (50) percent of the time to turn, grasp, and twist objects; use his fingers on both hands one hundred (100) percent of the time for fine manipulations; and use both arms fifteen (15) percent of the time to reach, including overhead reaching. Plaintiff could stoop and crouch five (5) percent of the time during an eight (8) hour workday. Dr. Chandrasekhar found Plaintiff would have good days and bad days (R. 470). Dr. Chandrasekhar found Plaintiff would be absent from work once a month due to his impairments. Dr. Chandrasekhar noted that "weather extremes/temperatures aggravate[d]" Plaintiff's ability to work on a sustained basis (R. 471).

On December 28, 2008, Plaintiff was transported to the emergency department of Ohio Valley Medical Center for intoxication. Except for intoxication and a "small bump . . . on the left side of the [Plaintiff's] forehead," Plaintiff's examination was normal (R. 466). Plaintiff's blood work showed the presence of alcohol (297 mg/dl) and benzodiazepines (R. 467). The CT scan of his head showed "no acute intracranial pathology" (R. 465). He was released to Northwood (R. 466).

It was noted on Plaintiff's DDS Case Development Sheet, dated January 14, 2009, that, when he had been in prison , he had not received "treatment b/c the prison system didn't make it sound like it was that bad and he didn't think he needed to receive treatment, since he doesn't know that much about it" (R 412).

Bob Marinelli, Ed.D., completed a Psychiatric Review Technique of Plaintiff on January 16, 2009. He found that Plaintiff was positive for affective disorder, which was a "[d]epressive syndrome characterized by . . . sleep disturbance, difficulty concentrating or thinking, thoughts of suicide, and hallucinations, delusions, or paranoid thinking (R. 482, 485). Dr. Marinelli found Plaintiff had

moderate restrictions in his activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Marinelli found Plaintiff had experienced no episodes of decompensation (R. 492). Dr. Marinelli reviewed Plaintiff's October 20, 2008, medical record; his March 20, 2008, outpatient psychiatric service records; his March 20, 2008, mental evaluation at Northwood; and progress notes from March, 31, 2008, through December 8, 2008, from Northwood. Dr. Marinelli noted Plaintiff had not been hospitalized for psychiatric treatment (R. 494).

Dr. Marinelli completed a Mental Residual Functional Capacity Assessment of Plaintiff on January 16, 2009. He found, in the "understanding and memory" category, that Plaintiff was moderately limited in his ability to understand and remember detailed instructions and that Plaintiff was not significantly limited in his abilities to remember locations and work-like procedures and understand and remember very short and simple instructions. As to the "sustained concentration and persistence" category, Dr. Marinelli found Plaintiff was not significantly limited in his ability to carry out very short and simple instructions; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; and ability to make simple, work-related decisions. Plaintiff was moderately limited in his ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to complete a normal workday and work week without interruptions from psychologically based symptoms; and ability to perform at a consistence pace without an unreasonable number and length of rest periods (R. 496-967). As to "social interaction," Dr. Marinelli found Plaintiff was not significantly limited in his ability to interact appropriately with

the general public, ask simple questions, request assistance, maintain socially appropriate behavior, or adhere to basic standards of neatness and cleanliness. Plaintiff showed no evidence of limitation in his ability to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. As to Plaintiff's "adaption," Dr. Marinelli found Plaintiff was not significantly limited in his ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places, or use public transportation. Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting. He had no evidence of limitations in his ability to set realistic goals or make plans independently of others (R. 497). Dr. Marinelli found Plaintiff's mental residual functional capacity was "reduced by moderate limitations in concentration, sustained persistence & adapting to change." Dr. Marinelli found Plaintiff had the "capacity for routine competitive employment involving short & simple instructions with low pressure & adaptive demands" (R. 498).

Dr. Sethi completed a disability determination examination of Plaintiff on February 2, 2009, for the West Virginia Disability Determination Service. Plaintiff stated he had bone spurs in his neck and spondylosis. He had had degenerative disease for fifteen (15) years. He had "had conservative management." Plaintiff reported he had been involved in a motor vehicle accident in December, 2005, for which he was treated with physical therapy, but no injections. Plaintiff stated he had no numbness, weakness, paralysis, or loss of control of his bladder or bowel. Plaintiff's pain was chronic, and it was aggravated by heavy lifting. Plaintiff reported he had carpal tunnel syndrome, which caused him to drop objects. He had undergone no injections or surgeries; he had not used splints. Plaintiff stated he had no difficulty with activities of daily living due to carpal tunnel syndrome, but he did not think he could lift heavy objects or do repetitive work (R. 748). Plaintiff reported he had been diagnosed with

hepatitis C when he was incarcerated in 2007. He stated he had no jaundice, liver enlargement, or ascites and was not receiving treatment for the condition. Plaintiff informed Dr. Sethi that he had depression and bipolar disorder , which resulted in his being separated from his wife in 2006 and for which he had engaged in individual therapy and was taking medication (R. 749).

Upon examination, Dr. Sethi found Plaintiff was well nourished and in no acute distress. His blood pressure was 110/70; he was five feet, eleven inches (5'11") and weighed two-hundred-fourteen (214) pounds. His head, eyes, ears, nose, throat, neck, lungs, heart, and abdomen were normal (R. 749-50). Plaintiff had normal ranges of motion in his lower extremities; his straight leg raising test was negative at eighty (80) degrees flexion on the right and left. In the upper extremities, mild tenderness anteromedially was found in the shoulders. Impingement was negative. Rotator cuff muscle strength was normal; elbows and wrists were normal; Tinel and Phalen tests were negative. Plaintiff had no muscle atrophy. Plaintiff had mild tenderness on the dorsum of the wrists, bilaterally. Plaintiff's grasp, pinch manipulation, and fine coordination were normal. He had no Heberden's nodes. As to Plaintiff's spine, there was moderate tenderness at C6-7. Forward flexion was thirty-five (35) degrees, extension was forty (40) degrees, lateral flexion was thirty (30) degrees, and rotation was sixty (60) degrees. Plaintiff's thoracic spine was normal. He had mild tenderness of the lumbar spine at the sacroiliac area. Plaintiff had no muscle spasm or scoliosis. His lumbar forward flexion was seventy (70) degrees, extension was twenty (20) degrees, lateral bending was twenty (20) degrees, and rotation was thirty (30) degrees. Plaintiff's cranial nerves were normal. Plaintiff's motor, sensory, propioception were normal. His Romberg test was negative. Plaintiff's skin showed a faint scar of a second degree burn on his right, upper arm and right flank area (R. 750).

Dr. Sethi's impressions were for history of major depression and bipolar disorder, spondylosis of the neck, past history of carpal tunnel syndrome, and history of hepatitis C. Dr. Sethi found Plaintiff's ability to work at physical activities "may be moderately limited" (R. 750).

On February 25, 2009, Dr. Lateef competed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Lateef found Plaintiff could occasionally lift and carry up to twenty (20) pounds, frequently lift and carry up to ten (10) pounds, sit and stand and/or walk for a about six (6) hours each in an eight (8) hour workday, and push/pull unlimited (R. 502). Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Plaintiff could never climb ladders, ropes, or scaffolds (R. 503). Dr. Lateef found Plaintiff had no manipulative, visual or communicative limitations (R. 504-05). Dr. Lateef found Plaintiff's exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation was unlimited, and he should avoid concentrated exposure to extreme cold, vibration, and hazards (R. 505). Dr. Lateef noted Plaintiff's activities of daily living included doing laundry, driving and shopping. Plaintiff was "unable to cook like he used to due to pain." He did no yard work. He could lift fifteen (15) or twenty (20) pounds comfortably. Squatting, bending, standing, walking, kneeling, and climbing stairs increased Plaintiff's pain. He could walk one (1) or two (2) blocks without pain. Dr. Lateef found Plaintiff was partially credible (R. 506). Dr. Lateef reviewed Plaintiff's January, 2008, EMG; November, 2008, spine x-rays; and February, 2009, consultative examination. Dr. Lateef reduced Plaintiff's RFC to light (R. 508). On February 27, 2009, Dr. Lateef reviewed the results of Plaintiff's laboratory tests, which did not alter his findings (R. 509).

Plaintiff participated in individual therapy on March 2, 2009. He informed Therapist Farmer that he was depressed because he had been in court last week, had to return to court in four (4) weeks,

and may go to jail at that time. Plaintiff stated that, at times, he wished he was not alive, but he would not harm himself because of his mother and children (R. 511).

Plaintiff presented to N.P. Smith on March 2, 2009, for medication management. He reported he was not sleeping well; he felt depressed and anxious. Plaintiff stated he was "very depressed and distraught" because he "believe[d] he would be returning to jail in Ohio for pack (sic) child support." Plaintiff reported that he had "got[ten] drunk" on the night of February 27, 2009, when he learned he may be incarcerated. Plaintiff had "thoughts of self harm but vowed" he would not harm himself because he loved his mother and children and because of his father's recent death. Plaintiff was cooperative; his appearance was unremarkable; his activity level was normal; his speech was brief; his affect was blunted; he had no hallucinations; he was oriented to person, place, and time. N.P. Smith assessed severe depression and situational difficulty. N.P. Smith prescribed Invega, Trazodone, Cymbalta, Lamictal, Buspar, and Vistaril (R. 510).

Dr. Chandrasekhar diagnosed anxiety, degenerative joint disease, carpal tunnel syndrome, Schmorl's node, and radiculopathy on March 12, 2009. He prescribed Roxicodone (R. 736). Dr. Chandrasekhar wrote a letter, dated that same date, wherein he noted Plaintiff was being treated by him for chronic low back pain, chronic lumbosacral radiculopathy, and chronic bilateral carpal tunnel syndrome, which were all "dibilitating (sic) conditions" that made "it impossible for this patient to work." Dr. Chandrasekhar wrote that Plaintiff's conditions would last for at least a year (R. 737).

On May 9, 2009, G. David Allen, Ph.D., reviewed Dr. Marinelli's January 16, 2009, Mental Residual Functional Capacity Assessment and Psychiatric Review Technique of Plaintiff and affirmed both (R. 746).

On May 11, 2009, Dr. Franyutti reviewed the evidence of record and Dr. Lateef's February 2009, opinion and affirmed same (R. 747).

On May 18, 2009, Plaintiff's treatment at Northwood was terminated due to his being incarcerated (R. 513).

Plaintiff presented to the emergency department at Reynolds Memorial Hospital on July 2, 2009, with complaints of severe, recurring depression and possible bipolar disease. Plaintiff stated he had been released from jail three (3) day earlier and had not had any medication for those three (3) days. He had a headache. He was shaky (R. 880). He had not been able to sleep. He had visible tremors. He was alert and cooperative (R. 882). His mental examination was normal. He was diagnosed with anxiety. He was instructed to present to Northwood the next morning (R. 881).

Plaintiff presented to Northwood on July 21, 2009, and was admitted to the crisis stabilization unit for assessment of suicidal ideations and medication noncompliance. It was noted that Plaintiff presented with "acute levels of depression, worthlessness, hopelessness/helplessness, anxiety, impulsivity, loss of interest in activities; severe levels of self neglect, crying, mania, high energy, poor concentration/judgment, panic, agitation, decreased appetite/sleep, blunted affect; and moderate levels of suspiciousness, tangential thinking, withdrawal." These symptoms were "compounded by medication noncompliance." Plaintiff had been released from jail three (3) weeks earlier after having been incarcerated for one-hundred (100) days. Plaintiff informed the medical professional that his "medications were switched while incarcerated." Plaintiff stated racing thoughts interfered with his ability to concentrate. He was not suicidal, even though he had thoughts of not wanting to live anymore. He was unable to maintain eye contact. Plaintiff reported he ate one (1) meal per day. Plaintiff stated he had separated from his wife and she was "playing head games with him at this time."

He reported constant pain. The medical professional noted Plaintiff had been prescribed Celexa, Eskalith, Buspar, and Desyrel but was noncompliant with his "medication protocol." Upon examination, Plaintiff was oriented, times four (4); had rapid speech; had unkempt appearance; had tangential thought content; had withdrawn sociability; and had mildly impaired memory (R. 515).

It was noted that Plaintiff had never had the following symptoms/behaviors: violence, self injury, oppositional behavior, bizarre behavior, delusions, loose associations, thought blocking, concept disorganization, apathy, hyperactivity, flat affect, or inappropriate affect. During the past ninety (90) days, Plaintiff had been homicidal, had tangential thinking, and had mania. During the past ninety (90) to one-hundred-eighty (180) days, Plaintiff's behaviors/symptoms included suicidal thoughts and hostility. Plaintiff's symptoms/behaviors, which occurred for more than three-hundred sixty-five (365) days, were self neglect, withdrawal, impulsivity, poor judgment, hallucinations, paranoia, poor concentration, suspiciousness, depression, guilt, anxiety, blunted affect, feeling of worthlessness, feelings of hopelessness and helplessness, crying, panic, phobia, agitation, high or low energy, distractibility, changes in appetite, increased or decreased sleep, and loss of interest in activities. The medical professional found these symptoms/behaviors "troubled" Plaintiff "quite a bit" (R. 516). It was noted that Plaintiff had never had a "problem with alcohol." Plaintiff reported he had not used alcohol in the past six (6) months (R. 517). Plaintiff reported he was "not at all" troubled by family problems (R. 518). Plaintiff reported he had been placed on probation for five (5) years (R. 519). The medical professional found Plaintiff had moderate impairment in caring for himself; mild impairment in activities of community living; moderate impairments in social, interpersonal, and family functioning; moderate impairments in concentration and task performance; and moderate maladaptive, dangerous, and impulsive behaviors (R. 520). The medical professional made the

following diagnostic impressions: major depression, recurrent and with psychosis; alcohol dependence; chronic pain; and GAF of 25 (R. 521). Plaintiff stated he had waited for three (3) weeks to seek mental health treatment because he had just been released from jail and did not "want to feel 'locked up' so soon" (R. 522). Plaintiff was prescribed Restoril, Trazadone, Vistaril, Trileptal, and Paxil. He was instructed to continue medicating with Soma, Claritin, and Roxicodone. Blood work was ordered (R. 524). Plaintiff's prognosis was "fair" (R. 530).

On July 21, 2009, a medical professional at Northwood noted Plaintiff was being observed every fifteen minutes as a suicide preventive measure. It was noted that Plaintiff was irritable, had strained affect, made poor eye contact, was quiet and withdrawn, appeared to be guarded, was watchful, was distracted, had difficulty maintaining his train of thought, had depressed mood, had disheveled appearance, had low energy and motivation, was tense and uptight, paced, and lacked insight (R. 659-60). Plaintiff participated in group therapy. He was active in group discussions and exercises, identified "coping tools," and completed therapy worksheets (R. 661-65).

Registered Nurse Meyer assessed Plaintiff's daily functioning on July 22, 2009, and found the following: Plaintiff was not homicidal; was slightly irritable; paced; was quiet; had no hallucinations or delusions; was nervous around others; had brief eye contact; was easily distracted; looked around often; had delayed responses; was uptight and tense; had a shaky voice and hands; requested medications; had no mania; ate most of his food; and appeared to be overwhelmed (R. 640-41). Plaintiff stated he was "feeling irritable" because he was "off meds." He isolated himself because he did not "feel well." He reported low self esteem, depression, poor concentration, racing thoughts, and poor sleep (R. 658). Plaintiff stated that he hated his life, wanted to "crawl in a hole somewhere," and felt "nothing went right" (R. 640). He said he felt "'crazy'" and as if "everybody [was] talking about

him." He tried to kill himself while he was incarcerated in 2007; he used to be a "cutter." Plaintiff reported he attempted to get medication at the "Ash Ave office" when he was released from jail, but he was told that he would have to be admitted to the crisis unit. He was not "willing to be locked up again right away" (R. 684). He was having difficulty completing activities of daily living due to lack of energy and motivation (R. 686). Plaintiff reported he had lost his willpower, he worried about everything, he sometimes panicked all day, and he could not "handle it when it [got] loud" (R. 685). Plaintiff stated he wanted to live and he tended to be happy, hopeful and positive. Plaintiff stated his concentration was "somewhat impaired when he [was] stable" (R. 686). Plaintiff was medicated with Trileptal, Trazadone, and Restoril; his dosage of Vistaril was increased (R. 641).

Plaintiff participated in group therapy on July 22, 2009. He reported he had panic attacks and could not concentrate, was nervous, felt hopeless, had racing thoughts, felt confused and paranoid, and had "high" anxiety. (R. 643-44). Plaintiff acknowledged that his not taking medication contributed to his elevated levels of anxiety. Plaintiff also acknowledged that his "difficulties with drugs and alcohol" contributed to his depression. He rated himself as "5" on the "feeling scale" of 1-5 (one-to-five), with five (5) being the best (R. 647). He completed tasks, actively participated in therapy exercises and discussions, wrote in his journal, and listed his major fear as returning to jail, which caused him to hallucinate, have delusions, and be paranoid (R. 642-57).

Registered Nurse Doy assessed Plaintiff's daily functional impairments on July 23, 2009, and found he appeared tense, was occasionally irritable, was quiet, interacted with peers on a limited basis, was guarded, had fleeting eye contact, paid attention in group therapy, appeared to be distracted, responded slowly, had depressed mood, had blunted affect, was disheveled, had low energy and motivation, was tense, paced, appeared to be tired, and lacked insight. Plaintiff took medications when

prompted (R. 620-21). Plaintiff's appearance was normal, posture and gait were normal, affect was blunted, mood was anxious and depressed, and speech was normal. He was oriented (R. 676). It was noted Plaintiff was making progress toward crisis resolution (R. 677).

Plaintiff participated in group counseling on July 23, 2009. He stated he was depressed because he did not "feel like himself." He reported poor concentration and "memory problems." He feared he would have to return to jail. It was noted that he was active, he finished tasks, his mood was depressed, and his affect was irritable. He encouraged other participants in therapy. Plaintiff stated "'crowds of people'" triggered depression and panic symptoms. Plaintiff identified his back pain as a trigger of his panic symptoms. The exercises in group therapy helped Plaintiff understand his responses to pressures. He was able to identify negative thoughts and use cognitive restructuring, coping strategies, and "normalizing" as ways to minimize them. He kept a journal. (R. 622-39)

At Northwood, on July 24, 2009, it was noted that Plaintiff exhibited no symptoms of being suicidal, being homicidal, having hallucinations or delusions, and having mania. He was positive for hostility, social withdrawal, paranoia, poor concentration, depression, anxiety, and sleep changes. Plaintiff took his medications and stated they were "starting to work" (R. 601-02). Plaintiff was found to have appropriate appearance. His gait, posture, motor activity, eye contact, and speech were normal. His affect was blunted; he was anxious and depressed (R. 674). It was noted that Plaintiff was making relevant progress toward crisis resolution (R. 675). The crisis stabilization follow-up examination read that Plaintiff had no suicidal ideations, homicidal ideations, hostility, violence, self-injury, hallucinations, delusions, tangential thinking, loose associations, thought blocking, or crying. Plaintiff had the following mild symptoms: self neglect, paranoia, blunted affect, mania, and change in appetite. Plaintiff's moderate symptoms included suspiciousness, panic, agitation, and change in sleep patterns.

Plaintiff had the following severe symptoms: withdrawal, impulsivity, poor judgment, poor concentration, depression, anxiety, worthlessness, hopelessness, helplessness, low energy, and loss of interest in activities. Plaintiff had no acute symptoms. His GAF was twenty-eight (28). Plaintiff reported he had been released from jail on July 1, 2009, and was not provided any medication. He "'felt panic all the time' w/o meds." Plaintiff stated that he last had suicidal ideations "'before [he] went off [his] meds' and after release from jail." Plaintiff reported he was as depressed as when his father died in January, 2009 (R. 682). Plaintiff participated in group therapy. He provided relevant information (R. 603). He completed paperwork (R. 607). Plaintiff was passive but was able to identify positive coping tools, which included walking and reading (R. 611, 618). He journaled to express his feelings (R. 612).

It was noted on July 25, 2009, at Northwood, that Plaintiff had positive symptoms or behaviors of suicide, hostility, social withdrawal, paranoia, poor concentration, depression, anxiety, mania, and decreased sleep (R. 584-85). He had nightmares about prison. He was worried about going back to prison and receiving disability (R. 598). Plaintiff reported that he was restless, nervous, edgy, and depressed; his sleep was better and he was less fidgety and helpless. Plaintiff took his medications and stated they were working. He attended group therapy (R. 585). Plaintiff reported he felt better, but he continued to feel angry, paranoid, irritated, and depressed. He had poor concentration and memory problems (R. 586). He was found to have slow speech, slow psychomotor activity and, flattened affect; however, on the psychiatric review, dated July 25, 2009, it was noted that Plaintiff's speech was normal; his posture and gait were normal; his motor activity was normal. His affect was blunted; his mood was anxious and depressed. He was oriented, times four (4). It was noted he was making relevant progress toward crisis resolution ((R. 591, 672-73). At group therapy, Plaintiff completed

tasks and participated well (R. 587). Plaintiff stated he would become more active (R. 588). He participated in group discussions (R. 589). He stated that when he lacked structure and organization, he became depressed, and he was able to identify his symptoms (R. 590, 599). Plaintiff stated, to combat his psychiatric condition, he socialized and walked (R. 591). He encouraged others who participated in group therapy (R. 594). Plaintiff recognized a "coping tool" would help him cope with pressures (R. 595). He wrote in a journal to express his feelings (R. 596).

At Northwood, on July 26, 2009, it was noted that Plaintiff was positive for the following symptoms/behaviors: suicidal, hostility, socially withdrawn, paranoia, poor concentration, depression, anxiety, mania, and poor sleep. Plaintiff was taking his medications promptly and stated they were working (R. 568). Upon examination, it was found that Plaintiff's appearance was appropriate, and his posture, gait, and motor activity were normal. Plaintiff's affect was flat; he avoided eye contact; he had no hallucinations or delusions; he was not suicidal or homicidal (R. 670). It was noted that Plaintiff's symptoms persisted and he required intensive monitoring (R. 671). Plaintiff participated in group therapy. He completed tasks that were asked of him (R. 569, 579). He was active (R. 573). He completed worksheets independently. He was positive; however, he reported he was easily distracted, had difficulty paying attention, had memory problems, felt sad, had low self esteem, felt anxious and nervous, and felt hyper (R. 570-71). Plaintiff reported he was not sleeping well due to pain (R. 572). Plaintiff stated he felt "much better" now that he was "back on [his] meds" (R. 574). Plaintiff reported he had nightmares about prison (R. 581).

On July 27, 2009, at Northwood, Plaintiff was not homicidal, was irritable, had social withdrawal, had no hallucinations or delusions, had paranoia, had poor concentration, was depressed and anxious, had no mania, and was eating (R. 548-49). Plaintiff stated he felt "some meds [were]

working" and Plaintiff took his medication with prompting (R. 549). Plaintiff actively participated in group therapy (R. 550). He stated he felt "hyper," was angry with "'the system,'" had poor concentration, and had "some depression" (R. 551). Plaintiff his anxiety as a "2," with one (1) being no anxiety and five (5) being extremely anxious. Plaintiff feared returning to prison (R. 552). He demonstrated moderate social interaction with others during the group session; he was active and willing to participate (R. 553, 555). He had good focus and concentration (R. 560). He stated he would use "talking" as a coping tool (R. 563). Plaintiff stated that he needed to take his medications as prescribed so he can "keep [his] mind right" (R. 554). Upon examination, it was noted that Plaintiff's appearance was appropriate; his posture, gait, motor activity, and speech were normal. Plaintiff's affect was blunted; his mood was anxious and depressed. He was neither suicidal nor homicidal; he had no hallucinations or delusions. He was oriented (R. 668). Plaintiff had made relevant progress toward crises resolution (R. 669).

On July 28, 2009, Plaintiff participated in group therapy at Northwood. He stated he was "doing better" because he was on medication and hoped to be discharged (R. 539). He wrote in his journal (R. 540-41). He participated in group discussions (R. 542-43). He completed group worksheets independently (R. 545-46).

On July 28, 2009, it was noted, at Northwood, that Plaintiff did not exhibit suicidal symptoms or behaviors, but he stated that "life [was] not worth living." Plaintiff was irritable, tended to stay away from others, had no hallucinations or delusions, showed minimal paranoia, had poor concentration in that he was slow to respond, had depression and anxiety, had no mania, ate the "majority [of] meals," and had decreased sleep (R. 534-35). Upon examination, Plaintiff's appearance was found to be appropriate; his posture, gait, motor activity, and speech were normal. His affect was

45

labile and restricted; his mood was labile; he was oriented, times four (4). He was not suicidal or homicidal (R. 666). It was found that he required intensive monitoring, had made relevant progress toward crisis resolution, and that his psychiatric symptoms persisted (R. 667). A crisis stabilization follow-up examination document read that Plaintiff had reported increased ability to focus, no racing thoughts, and increased mood. Plaintiff was less anxious and sleeping normally. He had experienced no panic attacks since June 24, 2009. Plaintiff reported no suicidal thoughts (R. 680). Plaintiff attended group therapy and took his medication. Plaintiff wanted "to leave" (R. 535). Plaintiff reported decreased symptoms of depression and anxiety (R. 544).

On July 29, 2009, Plaintiff reported he had slept for seven (7) hours, which was "very good for him." He felt "'wonderful.'" Plaintiff stated he had been a "'mess when [he] came in'" because he had been "off [his] meds" due to his having been incarcerated. Plaintiff reported he continued to have "legal problems." Plaintiff stated he had no panic attacks. His mother, niece, sister, and niece's husband were "supportive" (R. 678).

Plaintiff's crisis stabilization services were discontinued at Northwood on July 29, 2009. He was instructed to participate in medication management, individual therapy, and case management services (R. 525, 695).

Plaintiff participated in individual therapy at Northwood on August 4, 2009. His appearance and grooming were unremarkable; he had suicidal and violence ideations; his speech was loud; his mood was depressed; his affect was blunted. He had "broken sleep," which caused him to be hyper. Plaintiff reported he experienced pain due to a 2005 automobile accident. He medicated his pain with Roxicodone and Soma; the pain medication "help[ed]." Plaintiff reported he attempted to kill himself in 2007 when he was in jail (R. 697). Plaintiff reported he had been incarcerated four (4) times for

failure to pay child support and was currently on probation for five (5) years. Plaintiff stated he had "lost everything." He could not work; he had no income; he lived with his mother, who was paying his child support. Plaintiff reported he watched television "a lot" and took walks. He had difficulty sleeping. He had to force himself to do anything. His anxiety was two (2) on a scale of one-to-five (1-5). Plaintiff thought about killing himself every day and felt "it [was] a part of him but he [did not] dwell on it." He was not suicidal; he just thought about it (R. 698).

On August 11, 2009, Plaintiff reported to N.P. Smith for medication management. He reported he was not sleeping well. He felt depressed, anxious, and irritable. He had moderate mood swings. He had no hallucinations, delusions, or paranoia. He had passive suicidal ideations. He was cooperative; his appearance was unremarkable; his activity level and speech were normal; his affect was blunted; he was oriented to person, place, and time. N.P. Smith noted Plaintiff was having "situational difficulties." She prescribed Trazadone, Paxil, Trileptal, Vistaril, and Seroquel and noted Plaintiff's primary care physician prescribed Restoril, Soma, Oxycodone, and Claritin (R. 699).

On August 12, 2009, Plaintiff participated in individual therapy at Northwood. Plaintiff reported racing thoughts and suicidal ideations, even though he would not act on those thoughts. He forced himself to get out of bed, shower, and dress. Plaintiff stated he was depressed and angry because of "how his life ha[d] turned out." He had no income; he had been to jail four (4) times; he had nightmares about being burned and going to prison. Plaintiff stated prison made him a "harder person"; he "learned to hate blacks" while in prison. Plaintiff stated his mood interfered with his ability to function; however, talking to a person, watching television, or taking a walk was "helpful for his mood." He liked to ride horses, even though he had to force himself to do it. Plaintiff's eye contact was fair to good. Plaintiff stated that he started worrying about issues, then he would take his

medications and feel better. Plaintiff stated he and his wife of eleven (11) years separated in 2006 and his wife took their daughter with her. That "bother[ed] him." Plaintiff stated he experienced neck and head pain, but his pain medication gave him relief (R. 700). Plaintiff stated he is most "bother[ed]" by not being able to work, not having income, taking medication, not having his own home, not having a girlfriend, the "child support people and his probation officer," and going back to jail. He controlled his anger "pretty" well. Plaintiff had no difficulty going or staying asleep; he had difficulty getting up in the morning. Plaintiff stated he had difficulty reading due to poor concentration; however, he was reading *The Horseman* and had read John Grisham novels (R. 701).

On August 18, 2009, Plaintiff presented to N.P. Smith for medication management. Plaintiff reported he had difficulty falling and staying asleep. He felt depressed, anxious, and irritable. He had racing thoughts. He had moderate mood swings, nightmares, and occasional paranoia. He was not suicidal or homicidal. He had occasional auditory hallucinations; he heard people talking or making noises. He did not use drugs or drink alcohol. N.P. Smith found Plaintiff was cooperative. His appearance was unremarkable; he was restless; his speech was pressured; his affect was labile; he was oriented. N.P. Smith found Plaintiff was "having difficulty." She prescribed Seroquel, Vistaril, Trileptal, and Cymbalta. N.P. Smith noted Plaintiff's primary care physician prescribed Restoril, Soma, Oxycodone, and Claritin to Plaintiff (R. 702).

Plaintiff presented to N.P. Smith on August 24, 2009, for medication management. He stated he had difficulty falling and staying asleep. He felt anxious and irritable, but less so than the prior week. Plaintiff stated he felt better this week; his depression and anxiety were lower. He had fleeting suicidal ideations, but no plan or intent. N.P. Smith found Plaintiff was cooperative, his appearance

was unremarkable, his activity level was normal, his affect was blunted, he was oriented, and he had no current hallucinations. N.P. Smith prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 703).

Dr. Meyers examined Plaintiff on August 26, 2009, for frontal headaches and vision fading. Dr. Meyer ordered additional testing (R. 760-61).

Plaintiff participated in individual therapy on August 26, 2009, at Northwood. Plaintiff's eye contact was poor. Plaintiff reported he had a "'relapse' from feeling good to feeling awful" due to a medication change; however, he was, at the time of the therapy, "better than he was." Plaintiff reported difficulty sleeping, nightmares, and pain that woke him "at least 10 times last night." It was "helpful" for him to "go[] outside a lot and tinker[] around with his nephew" (R. 704). Plaintiff reported he took walks and rode horses. He could not concentrate well enough to read a book. He felt "better" if he watched television, took a walk, or talked with family and/or friends. Plaintiff thought "a lot" about his having been burned and his having been incarcerated, but he could "do something quick to distract" himself from those thoughts. Plaintiff stated he was a cutter, but he had not cut himself in a while. Plaintiff collected knives (R. 705).

Plaintiff presented to N.P. Smith on September 1, 2009, for medication management. Plaintiff reported he had difficulty falling and staying asleep. He had no mania. He felt depressed, anxious, and irritable. He had no problems with medications. Plaintiff was feeling better. He had fewer passive suicidal ideations. He "definitely notice[d] improvement in" his symptoms. He was cooperative; his appearance was unkempt; his activity level was normal; his rate of speech was rapid; his affect was normal; he was oriented. N.P. Smith prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 706).

Plaintiff presented to N.P. Smith on September 8, 2009, for medication management. Plaintiff reported he had difficulty falling and staying asleep, but he was sleeping better. He felt depressed and

irritable. He had been forcing himself to do things and he felt better afterwards. He had fleeting suicidal ideations. His paranoia was low; he had no hallucinations. He was cooperative. His appearance was unremarkable, activity level was normal, affect was normal, and speech was focused. Plaintiff was oriented. N.P. Smith prescribed Cymbalta, Vistaril, and Trileptal (R. 707).

Plaintiff participated in individual therapy on September 9, 2009. It was noted that Plaintiff was making progress toward his goal. His depression was two (2) on a scale of one-to-five (1-5). Plaintiff reported he slept, but he did not feel rested. His symptoms worsened in the evening. He reported ongoing "problems with concentration." Plaintiff stated he tried not to isolate himself because isolation made his symptoms worse. He walked daily. He had been diagnosed with glaucoma (R. 708). Plaintiff stated he felt "crazy" at times. He had panic attacks, racing thoughts, and abnormal thoughts. Plaintiff had "a lot of fear thinking of dying"; he also thought of ways to die (R. 709).

Dr. Meyers diagnosed Plaintiff with open angle glaucoma on September 11, 2009. Dr. Meyers prescribed Xlantan (R. 762).

On September 22, 2009, Plaintiff presented to N.P. Smith for medication management. Plaintiff reported he had difficulty falling and staying asleep. He had no symptoms of mania. He felt irritable, had mood swings, felt depressed, and was paranoid. Plaintiff stated he had no "problems with medications." Plaintiff stated he had urges to cut himself; he was afraid to go into the shower because he was scared due to visual hallucinations of spiders and bugs. He had fleeting suicidal ideations but no plan. Plaintiff's speech and affect were normal. He was oriented. N.P. Smith assessed mood swings, paranoia, and visual hallucinations. She prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 710).

Plaintiff participated in individual therapy at Northwood on September 23, 2009. Plaintiff's depression was rated as moderate. He was making "slow but steady" progress toward his goal; he was doing "better"; he was "not where he should be." Plaintiff was "still having problems since the seraquil (sic) was changed." Plaintiff reported feeling depressed due to his glaucoma diagnosis; his concentration was not better; he could not remember what he had read (R. 711). Plaintiff stated he had read a book about PTSD and "he has [it] from prison and the burn." He stated he never felt rested, his eyes bothered him, he was afraid he would go back to prison, he thought about his being in prison "and the things that happen there," and he saw "things," such as bugs, spiders and flashes. Plaintiff stated his depression was "up and down." He " force[d] himself to get into a shower due to his problem in prison. He [could] see the regional jail and he [saw] it everyday and it bother[ed] him bad" (R. 712).

On September 28, 2009, Dr. Meyers found Plaintiff was in "good compliance" with treating glaucoma, which he found was under "good control" (R.. 763).

Plaintiff participated in individual therapy at Northwood on October 7, 2009. His depression was found to be moderate. Plaintiff stated he was "not where he want[ed] to be but he [felt] he [was] getting there." Plaintiff reported broken sleep, nightmares, and pain ®. 713). Plaintiff stated he felt "like he [was] a nut bag" and like he was "crazy." He had racing thoughts. He had to force himself to do anything. It "help[ed] him to go talk to someone" (R. 714).

On October 13, 2009, Plaintiff presented to N.P. Smith for medication management. He had difficulty falling and staying asleep. He felt depressed and anxious. He had severe mood swings and irritability. Plaintiff stated he did not "feel right." Ten (10) days earlier, he had cut his arm and leg to "relieve anxiety." He did not feel suicidal. He reported he used no drugs and drank no alcohol. He "dwell[ed] constantly on something he might do to send him back to jail." He was paranoid and had

hallucinations; he saw spiders and bugs. N.P. Smith found Plaintiff was cooperative, his appearance was unremarkable, his activity level was normal, his speech was normal, his affect was blunted, and he was oriented. N.P. Smith prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 715).

Dr. Meyers found Plaintiff was complying with his medication regimen relative to his glaucoma on October 19, 2009. Dr. Meyers noted it was under "good control" (R. 763).

Plaintiff presented to N.P. Smith on October 20, 2009, for medication management. He reported he had "problems falling asleep or staying asleep." He had no mania, was depressed, was anxious, and was irritable. Plaintiff had no "problems" with his medications. Plaintiff stated he felt "a bit better." His mood was stable and he was less depressed. Plaintiff showed N.P. Smith his arms and legs; he stated he had not cut himself and he felt no urge to cut himself. He had fleeting suicidal ideations. Plaintiff felt paranoid; he was "afraid he [would] do something to jeopardize his probation and get sent back to jail." He had occasional hallucinations; he saw spiders. N.P. Smith found Plaintiff was cooperative, his appearance was unremarkable, his activity level was normal, his speech was focused, his affect was normal, and he was oriented. N.P. Smith prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 716).

It was noted, on November 2, 2009, at Northwood, that Plaintiff had experienced a reduction in symptoms. He had difficulties making and keeping appointments, following through on health care, and managing medications. He had some problems handling his personal finances, shopping for food and personal items, and accessing and using community resources. He had difficulty maintaining a social network, engaging in family and social activities, and handling conflict. He continued to report difficulty concentrating, but had experienced improvement during the past week. He had passive

suicidal thoughts; he would never act on them. It was recommended that Plaintiff continue to medicate his symptoms and participate in individual therapy (R. 723).

Plaintiff participated in individual therapy at Northwood on November 4, 2009. He was clean shaven; he stated he felt better. His dosage of Trileptal had been increased and that "helped." Plaintiff reported he watched a lot of television. He intended to walk outside more. Plaintiff had not cut himself; his eyes were bothering hm. Plaintiff stated he thought of suicide every day; "he [thought] it [was] a part of him" (R. 725).

Plaintiff presented to N.P. Smith on November 17, 2009, for medication management. He reported he had difficulty falling and staying asleep. He had no mania. He felt irritable. He denied any "problems" with medications. He felt anxious and paranoid about the future. He had visual hallucinations, which were of bugs and which were occurring less often. Plaintiff reported he was "feeling better" and "doing things to occupy time which help[ed] his depression." Plaintiff had no suicidal ideations. N.P. Smith found Plaintiff was cooperative, his appearance was unremarkable, his activity level was normal, his speech was loud, he was in "good spirits," and he was oriented. N.P. Smith prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 727).

Dr. Meyers examined Plaintiff on November 5, 2009, relative to glaucoma. Plaintiff said his eyes "still bother him in between" the use of his medication. Dr. Meyers found Plaintiff's glaucoma was under "great control." He prescribed medication (R. 764).

Plaintiff participated in individual therapy at Northwood on November 18, 2009. His progress was found to be "slow but steady." Plaintiff continued to "dwell excessively on thoughts of losing his sight and going back to prison." He was "paranoid and worried about stuff he may not have any control over." Plaintiff stated he was "better but still worri[ed] about a lot of things." Plaintiff enjoyed

"the nice weather." He tried to stay busy. He watched "a lot of action movies on TV" as a distraction. Plaintiff was "having a hard time doing things." "Overall," Plaintiff stated he was "not doing bad." He felt better than the last time he engaged in individual therapy. He was sleeping better, waking between 8:00 a.m. and 10:00 a.m. instead of sleeping until noon. He had back pain (R. 728).

Plaintiff participated in individual therapy at Northwood on December 9, 2009. Plaintiff reported he felt his "keeping out of the situation" wherein his mother was arrested for hitting his sister was a "good thing for him." Plaintiff reported he was "anxious all the time about worrying aobut (sic) going back to jail" (R. 730).

On December 15, 2009, Plaintiff presented to N.P. Smith for medication management. Plaintiff reported he had difficulty falling and staying asleep. He felt anxious and irritable. He had no "problems" with his medication. Plaintiff stated his "nerves [were] 'shot'" because of situational difficulty with family members. He was anxious, felt stress, and was depressed. Plaintiff had urges to cut himself, but he had no suicidal ideations. Plaintiff had poor appetite. Plaintiff stated he thought his symptoms would subside "as the situation settle[d] down." N.P. Smith found Plaintiff was cooperative, his appearance was unremarkable, his activity level was normal, his speech was normal, his affect was normal, and he was oriented. He had no hallucinations. N.P. Smith found Plaintiff was "having situational difficulties" and prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 732).

Dr. Meyers examined Plaintiff on December 16, 2009, for glaucoma. Plaintiff was in "good compliance" with using his medication; his glaucoma was under "good control." Dr. Meyers prescribed medication to Plaintiff (R. 764).

Dr. Timms examined Plaintiff on December 28, 2009, relative to his chronic neck and low back pain. Plaintiff had bilateral Tinel sign. His handgrips were "a little weak." He could spread his

54

fingers "without any problems." He had no dorsiflexion weakness in his arms. He had good strength in his lower extremities. He had equivocal straight leg raising test bilaterally. Plaintiff walked without difficulty. His deep tendon reflexes were symmetric. Dr. Timms order an EMG and MRI (R. 765).

On December 29, 2009, Plaintiff reported to N.P. Smith that he was not sleeping well. He felt anxious. He had no problems with medications. He was "still having difficulty w/family situation." He had frequent panic attacks. His depression was moderate. He did not want medication changes at that time. He had a "cutting episode last" week because it made him feel better. He stated he had been cutting himself since grade school. He had passive suicidal ideations due to his family problems and finances. N.P. Smith found Plaintiff was cooperative, his appearance was unremarkable, his activity level was normal, his speech and affect were normal, and he was oriented. She prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 733).

Plaintiff participated in individual therapy on December 30, 2009. Plaintiff reported he had high levels of anxiety that interfered with his ability to function. He had difficulty sleeping and was having nightmares about being in prison and getting burned. He took two (2) sleeping pills and that dosage was "not helping." He never felt rested. He was taking "a lot of pain pills . . . due to the hip pain." Plaintiff "hate[d] having to take all the pills he [took]." He made appropriate eye contact during the session (R. 734). Plaintiff's anxiety was related to his sister's being "out of the house." He was "back to cutting." He stated that "he was always going to cut himself." Plaintiff stated that he would kill himself "sometime down the road." He cancelled his doctor's appointment relative to his glaucoma. He forgot to take his medications. He thought that his "ptsd [was] really bad right now and at its worst." Plaintiff reported he was doing well on his medications (R. 735).

Plaintiff participated in individual therapy at Northwood on January 7, 2010. He was assessed with moderate depression. Plaintiff reported he had been diagnosed with bipolar disorder and PTSD, which was a result of a "burn accident and prison." Plaintiff stated he was "being seen because he [was] changing therapists due to therapist retirement." Plaintiff stated "suicide [was] part of" him; however, he thought of suicide passively (R. 795). Plaintiff stated he went from being in a "good mood to feeling like shit." Plaintiff was a cutter; it gave him "'instant relief'" and made him "'feel better.'" Plaintiff last cut himself two (2) weeks earlier. Plaintiff stated he was making "slow steady progress" in therapy and preferred an experienced therapist (R. 796).

On January 12, 2010, Plaintiff presented to N.P. Smith for medication management. He stated he was having difficulty falling and staying asleep. He felt depressed, anxious, and irritable. His energy level was normal. Plaintiff stated he had no problems with medication. He stated his home situation was improving; there was less stress and tension. He had cut his right calf two (2) weeks earlier. Plaintiff had no suicidal or homicidal ideations. Plaintiff had occasional hallucinations; he saw flashes and movement. N.P. Smith found Plaintiff was cooperative; his appearance was unremarkable; his activity level was normal; his speech was pressured; his affect was irritable; he was oriented. N.P. Smith found Plaintiff was "at a compensated baseline." N.P. Smith prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 797).

Plaintiff's January 13, 2010, electromyogram ("EMG") showed mild left carpal tunnel syndrome and moderate to severe right carpal tunnel syndrome (R. 788).

Plaintiff participated in individual therapy at Northwood on January 14, 2010. This was his first session with the new therapist. Plaintiff stated he had PTSD due to a car accident in 2005, and "as a result of the accident," Plaintiff "lost his wife, his car and his home." Plaintiff cut to relieve

pressure and depression and had cut since he was ten (10) years old. Plaintiff stated he did not want to die when he cut (R. 798).

Plaintiff's January 22, 2010, MRI of his lumbar spine showed degenerative L5-S1 disc narrowing without significant stenosis and degenerative signal change to the L1-3 discs without disc herniation or stenosis (R. 767, 775, 777). The cervical MRI showed "multiple spurring especially at the right C5-6 level where there may be some right nerve root compression, similar to the prior scan from 2006. No superimposed disc herniation is identified" (R. 768, 771, 776).

Plaintiff presented to N.P. Smith on January 26, 2010, for medication management. Plaintiff reported he was not sleeping well; his energy level was normal; he felt anxious. Plaintiff had no problems with his medication and he felt "pretty good." Plaintiff had nightmares, and he cut himself because of them. Plaintiff was cooperative. His appearance was unremarkable, activity level was normal, speech was normal and focused, and affect was normal. He was oriented. Plaintiff had no hallucinations. He had fleeting suicidal thoughts without plan or intent. N.P. Smith prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 800).

On January 26, 2010, Dr. Timms examined Plaintiff and noted his examination was "unchanged." Dr. Timms reviewed Plaintiff's MRI and noted Plaintiff's EMG showed "pretty bad carpal tunnel in the right hand." Plaintiff told Dr. Timms that his pain was "well controlled with oxycodone and the Soma." Dr. Timms found Plaintiff "seem[ed] to be doing pretty well from his neck and lower back pain" and referred Plaintiff to a physician for his carpal tunnel (R. 787).

Dr. Chandrasekhar examined Plaintiff on January 29, 2010. He diagnosed degenerative joint disease, degenerative disc disease L1-L3, bilateral carpal tunnel syndrome, and cervical spine spur at C5-6. He prescribed Roxicodone and referred Plaintiff to Dr. Bailes (R. 769).

Plaintiff participated in individual therapy on January 29, 2010, at Northwood. Plaintiff reported he was "still cutting" and cut when he was "anxious, depressed, angry, or [felt] worthless." Plaintiff stated that dreams "set off his emotions." He sometimes watched television to "get his mind off his dreams." Plaintiff reported he was "currently upset because he" had had "an argument with his family doctor" (R. 801). Plaintiff stated he knew it was "not appropriate" for him to cut himself," but that was "what he ahs (sic) always done." Plaintiff acknowledged that taking a walk or talking to another person may be ways to "deal with his anxiety" (R. 802).

On February 12, 2010, during individual therapy at Northwood, Plaintiff stated that he was "not doing well" because his niece called his home, which "upset[] him" and caused "problems for the family." Plaintiff reported he had nightmares, which caused anxiety. Plaintiff cut himself to relieve the anxiety. Plaintiff stated he had not taken "a couple of medications . . . for several days"; he was "going to start taking them again soon" (R. 803).

Plaintiff presented to N.P. Smith on February 16, 2010, for medication management. Plaintiff reported he was not sleeping well, felt depressed, had low energy and motivation, and had poor focus and concentration. Plaintiff forced himself to do "things." He felt hyper or sluggish. Plaintiff had fleeting suicidal ideations. He denied any cutting episodes. Plaintiff could not identify triggering events for his symptoms. N.P. Smith found Plaintiff was cooperative; his appearance was unremarkable; his activity level was normal; his speech was normal; his affect was normal; he was oriented. He had no hallucinations. He was diagnosed with depression. He was prescribed Cymbalta, Seroquel, Vistaril, and Trileptal (R. 805).

Plaintiff participated in individual therapy on February 26, 2010, at Northwood. Plaintiff stated he felt better; he "worried that he may have had a mini stroke" because his right foot was numb.

Plaintiff reported that he had increased anxiety because he was referred to a plastic surgeon for his wrist. Plaintiff reported he continued to have dreams about being in prison. He "sometimes" felt panic. Plaintiff stated he had poor concentration; however, he had "been staying busy." Plaintiff laughed and joked "some" during the therapy session. Plaintiff identified cutting himself as a negative coping skill; he recognized that taking a walk or watching television or a movie as distractions from "what was bothering him" (R. 806).

Dr. Corder, a psychiatrist at Northwood, completed a psychiatric evaluation of Plaintiff on March 2, 2010. He interviewed Plaintiff and reviewed his records from Northwood. Plaintiff stated he was depressed, had recurrent and severe post traumatic stress disorder, was a "cutter," and thought he was "bipolar." Plaintiff stated he had had psychiatric difficulties his entire life, but was vague when asked to elaborate. Plaintiff stated he had been cutting himself before he was a teenager in order to "feel better." He cut his arms and legs when depressed or to relieve stress, anxiety, or depression. Plaintiff reported he had not cut himself for three (3) weeks. Plaintiff stated he could "go for six months without cutting himself and then cut himself every week or two for months on end." Plaintiff stated his symptoms were chronic. Plaintiff stated he had nightmares about being in jail or getting burned. Plaintiff stated he had been burned in a brush fire in 2001. Plaintiff had thoughts of suicide during the "'bad times.'" Plaintiff feared "'going crazy.'" Plaintiff had not had thoughts of suicide for "some time" and he had no intentions or plans. He had attempted to kill himself in 2007 when he was in jail. He had racing thoughts and panic (R. 808). Plaintiff stated that, during "bad times," he had difficulty sleeping, had panic attacks five (5) or six (6) times per day, isolated himself, and was depressed for weeks (R. 808-09). Plaintiff stated he isolated himself when his mother went "'on and on'" about what he had to do around the house. His sister was a "main source of stress." Plaintiff

stated his mood was unstable. He tried to keep "busy" because that made him feel better. Plaintiff was easily overwhelmed. Anything could trigger depression. Plaintiff could not "tolerate" being around a lot of people or people who spoke loudly; however, Plaintiff did not have these issues when he was not depressed. Plaintiff stated his primary care physician was "'thinking about dropping'" him as a patient. Plaintiff reported hallucinations wherein he would see bugs or spiders. Plaintiff stated he felt people plotted against him and intended to harm him. Plaintiff stated he heard people "'mentioning [his] name' in a derogatory manner." Plaintiff would become hyper at times. Plaintiff stated there were times when he would sleep for three (3) hours, get up and cook food, and feel "real active." This occurred three (3) or four (4) times a week (R. 809). Plaintiff would write during these times of activity; however, Plaintiff did not describe "anything consistently in the way of any signs or symptoms of mania, nothing persistent and nothing problematic during those time." Plaintiff reported poor concentration. Plaintiff told Dr. Corder that, at the present time, he was "doing well, he felt the medication [was] very helpful and [did not] seem (sic) where there's any room or any need for improvement" (R. 810).

Plaintiff reported he had first received psychiatric treatment in 2006. Plaintiff stated he had separated from his first wife and had been in an automobile accident; he had "lost everything." Plaintiff thinks his primary care physician had prescribed Prozac, which had helped for two (2) weeks and then he felt worse. Plaintiff reported he was "'not bad'" when he had been medicated with Seroquel, Effexor and Depakote. He had been medicated with Risperdal in jail and had been medicated with Lexapro at another time. Dr. Corder noted Plaintiff had been treated with Invega, Cymbalta, Trazadone, and Paxil. Dr. Corder noted that Plaintiff had a "fair number of no-shows or cancellations" for treatment at Northwood. Plaintiff reported chronic neck and back pain and carpal

tunnel syndrome. Plaintiff reported numbness on the right side of his body and in his legs. Plaintiff reported a head injury and numerous falls (R. 810). Plaintiff fell fifteen (15) feet off a ladder in 2003 and experienced a head injury and was unconscious for fifteen (15) minutes. Plaintiff reported he had been involved in "other" motor vehicle accidents and had been rendered unconscious therefrom. He had been intoxicated during one accident. His current medications were Seroquel, Cymbalta, Restoril, Soma, Claritin, Capadex, and Roxicodone; he could not remember the names of any other medications he took (R. 811). Plaintiff reported the following family mental illnesses: an aunt had mental retardation; another aunt had schizophrenia; another aunt had received electric shock treatment; a son had bipolar disorder; a daughter had bipolar disorder; a brother had bipolar disorder. Dr. Corder noted Plaintiff's description of his children was for a schizophrenia disorder, not bipolar disorder. Plaintiff reported he had been physically abused as a child; did "'average'" in school; graduated high school; worked at jobs in construction; had been in prison for manufacturing marijuana; had been in prison for nonpayment of child support; had been arrested for domestic battery; had used drugs (cocaine, LSD, heroin, marijuana, methamphetamines) "'off and on'" his whole life but none recently; and smoked one and one-half (1 ½) packages of cigarettes per day (R. 811).

Upon mental status examination, Dr. Corder found Plaintiff was "unkempt, unclean and unshaven." He looked "ahead as he spoke" (R. 811). His answers to Dr. Corder's questions were vague, hesitant, and tangential. Nothing Plaintiff said was "blatantly bizarre or delusional." Dr. Corder noted Plaintiff's intellectual level was below average. He became briefly animated and "spontaneous in his stream of thought" during the interview. Plaintiff was not guarded, suspicious, irritable, or volatile. Dr. Corder found Plaintiff's descriptions of auditory hallucinations to be "atypical." Dr. Corder noted Plaintiff had no hallucinations, paranoia, or persecution thoughts during the interview.

Dr. Corder found Plaintiff was oriented to person, place, and time. He could perform simple calculations slowly and without error. He interpreted proverbs abstractly and appropriately "with no suspicious or paranoid overtones." Dr. Corder found Plaintiff's judgment was intact. His immediate recall was "four out of four objects immediately and three out of four objects after a few minutes." On the digit span, Plaintiff was able to repeat seven digits forward and four in reverse. Plaintiff had a "great deal of facial muscle twitching."

Dr. Corder diagnosed the following: Axis I - major depression, severe, with psychosis; "consider Schizoaffective Disorder, depressed or bipolar type of bipolar type I with depression with psychotic features" and mixed substance abuse and alcohol dependence, which was "reportedly in remission but with continued use of prescription narcotics and Soma, which is metabolized into a barbiturate[,] some of his mental status could be substance induced due to intoxication or the result of chronic use and other organic factors such as head injuries or even the burn could be a component of his difficulties"; Axis II - deferred; Axis III - chronic back and neck pain; Axis IV - "family conflicts"; and Axis V - GAF was twenty-one (21). Dr. Corder opined that Plaintiff should "stop taking the Soma and minimize or eliminate the narcotics." Dr. Corder also recommended Plaintiff discontinue medicating with Cymbalta and "would focus treatment on the use of antipsychotics." He noted that Plaintiff "describe[d] . . . progressive worsening and more rapid change in his mood," which, according to Dr. Corder, was "usually caused by either substance abuse, which [was] a strong possibility here or antidepressant-induced worsening of mood instability/bipolar/psychotic disorder." Dr. Corder found Plaintiff would "respond just as well or better to some of the other things he's on such as the Trileptal and Seroquel." Dr. Corder wanted to "try to confirm that he's not actively using other substances but that would only tell us why he's not getting any better rather than change anything

that we try to do in trying to get him better." Dr. Corder suggested changing Plaintiff's medication to Zyprexa. His prognosis was listed as "poor" (R. 813).

On March 4, 2010, Dr. Timms examined Plaintiff. Dr. Timms noted that Plaintiff had a "kind of confusing story about having some pain, more so in his right arm, and weakness in his right leg periodically." Plaintiff stated he thought he may have had a stroke. He reported no speech difficulties and no "problems with the right side of his face." Plaintiff had had a "falling out with Dr. Sekar" and was not getting any pain medications. Dr. Timms found Plaintiff had "trouble abducting the right arm and right humerus." His hand grip was "a little weak." He had Tinel sign in his right hand. He had right leg weakness in his hip flexors but "seem[ed] to have good strength in the right leg." Plaintiff walked without difficulty. His deep tendon reflexes were symmetrical. He could turn his head from side to side. His sensory examination was normal. Dr. Timms diagnosed right-sided weakness "with a confusing story." He "believe[d]" Plaintiff's symptoms were "more related to his neck, shoulder, and lower back," but he could not "rule out atypical stroke." Dr. Timms order MRIs of Plaintiff's head and right shoulder; he ordered a carotid Doppler examination. Dr. Timms instructed Plaintiff to take one (1) aspirin each day. He "gave" Plaintiff one-hundred-twenty (120) Oxycodone tablets and "told him that [he would] not give him any more than that." Dr. Timms told Plaintiff he would have to be treated at a pain clinic, where he could be monitored (R. 786).

Plaintiff's March 5, 2010, carotid flow study showed "no significant stenosis in either the left or right carotid system" but "some mild narrowing in the right external carotid artery" (R. 857).

On March 10, 2010, Dr. Meyers noted Plaintiff was in "good compliance" relative to medicating his glaucoma (R. 791).

Plaintiff participated in individual therapy at Northwood on March 12, 2010. It was noted that Plaintiff was "easily excitable." He had been "moving things out of the way of the predicted flood." This activity was stressful due to limited use of one of his arms. Plaintiff reported the mental status interview with Dr. Corder also made his anxiety "rise." Dr. Corder, according to Plaintiff, asked him "a lot of stupid questions and he will never go back to him." Plaintiff stated he had increased anxiety when "people start to talk to him about taking him off of his pain medications." Plaintiff reported his mood was "generally . . . good." Plaintiff stated his coping skills were "pretty good" (R. 814). Plaintiff stated talking with his family, taking his medication, and participating in therapy "help[ed] him deal with his anxiety." Plaintiff practiced deep breathing techniques to treat anxiety (R. 815).

Plaintiff presented to N.P. Smith for medication management. N.P. Smith noted Plaintiff had difficulty falling and staying asleep. He felt anxious, irritable, and was frustrated by the "things he can't do." Plaintiff reported he was having a good day. He had not cut himself in over a month. Plaintiff had no suicidal ideations, he was cooperative, his activity level was normal, his speech was rapid and rambling, his affect was irritable, and he was oriented. Plaintiff had intermittent hallucinations. N.P. Smith found Plaintiff was at a compensated baseline and was having difficulty. She prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 816).

On March 17, 2010, Dr. Shope diagnosed Plaintiff with bilateral carpal tunnel syndrome, acute radial nerve palsy, and cubital tunnel syndrome after completing a compression neuropathy examination of him (R.780-82).

Plaintiff participated in individual therapy at Northwood on March 26, 2010. It was noted that Plaintiff was making "slow but steady" progress toward his goals. Plaintiff reported he was "doing well." He was less anxious because his home was not flooded. His emotions were good. He was

trying to develop a better sleep routine. Plaintiff stated he took "too many medications and that he doesn't like taking medications." He was eating better (R. 817).

On March 29, 2010, Dr. Myers prescribed medication to Plaintiff for his glaucoma (R. 791).

Plaintiff's March 30, 2010, right shoulder MRI showed "acromioclavicular joint degenerative change and mild subacromial/subdeltoid bursitis" and "a tiny focus of increased signal of the supraspinatus near its humeral insertion, which could represent an area of acute tendinitis or partial tearing" (R. 770, 772, 773).

Plaintiff's March 30, 2010, brain MRI showed no abnormalities except for bilateral ethmoid and left frontal sinus disease (R. 774, 778).

On April 1, 2010, Dr. Timms noted that Plaintiff was "to see Dr. Naum in a couple of weeks as his primary care doctor." Dr. Timms noted that Plaintiff's shoulder MRI showed "some bursitis" and his head MRI was normal. His carotid Doppler examination was normal. Dr. Timms noted Plaintiff was to see Dr. Shope about his right hand. He also noted that Plaintiff's MRI of his back and neck "showed some degenerative changes and he may have some slight pinching of the nerve at C5-6." Upon examination, Dr. Shope found Plaintiff had right shoulder pain and "a little weak" hand grip. Dr. Timms told Plaintiff he could refer him to a neurosurgeon about his neck, "although [he did] not think that he has anything surgical." He "gave" Plaintiff one-hundred (100) Oxycodone tablets and told Plaintiff that he would "not give him anymore narcotics" (R. 785).

On April 5, 2010, Dr. Meyers treated Plaintiff for glaucoma (R. 791).

Plaintiff present to N.P. Smith at Northwood for medication management on April 6, 2010. Plaintiff stated he was not sleeping well. His energy level was normal. He felt depressed and irritable. He had "no problems with medications." Plaintiff reported he was having a good day. His symptoms

were improving "as the weather" improved. Plaintiff had "been active and getting out." Plaintiff's depression and racing thoughts were low; anxiety and irritability were moderate; suicidal thoughts were fleeting; and paranoia was unchanged. Plaintiff had not cut himself for over a month. N.P. Smith found Plaintiff was cooperative; his appearance was unremarkable; his activity level and speech were normal; his affect was normal; he was oriented; he had no hallucinations. N.P. Smith found Plaintiff was "making progress." She prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 819).

Plaintiff participated in individual therapy at Northwood on April 8, 2010. Plaintiff reported he felt he was doing better. His concentration was poor and he had difficulty focusing. He used positive self-talk instead of cutting himself to deal with anxiety. He identified that "owning his emotions" helped his mood. He recognized that it was "his job to keep people from pushing his buttons" (R. 820).

Plaintiff reported to the emergency department of Reynolds Memorial Hospital on April 8, 2010, with complaints of tooth and jaw pain. He had no trauma (R. 877-79).

On April 15, 2010, Dr. Lechner examined Plaintiff upon referral from Dr. Timms for right shoulder pain, right arm pain, and "some disuse" of his right arm. Plaintiff reported he had had the shoulder pain since February, 2010, but he had previous problems with his right shoulder as a result of a 1993 motor vehicle accident. Plaintiff had received chiropractic treatment for the condition. Plaintiff stated he had chronic neck and back pain and he medicated with Oxycodone. Upon examination, Dr. Lechner found no swelling or instability of Plaintiff's right shoulder. He had mild tenderness on palpation to his acromioclavicular joint and "greater tuberosity as well as some along the superior trapezius and posterior glenohumeral area. His active flexion was "about full" and he had one-hundred-fifty (150) degrees of abduction. Plaintiff had "some posterior glenohumeral pulling"

discomfort, and he "admitted to some discomfort that could be consistent with mild impingement with these maneuvers." The impingement maneuver across his chest was mildly positive. His strength was 5/5 in the deltoid rotator and biceps. Dr. Lechner reviewed four (4) x-rays of Plaintiff's shoulder, taken that day, and found they showed a type I-II acrominon but no soft tissue calcifications, normal glenohumeral and acromioclavicular alignment, no mesoacromion, and no significant degenerative changes. Dr. Lechner noted Plaintiff's March 30, 2010, MRI and the EMG showed "mild left and moderate to severe right carpal tunnel syndrome." Dr. Lechner's impression was for "mild impingement syndrome at the right shoulder and per MRI there is some AC arthritis though there is no significant radiographically." Dr. Lechner injected Plaintiff's right shoulder with Depo/Marcain and prescribed physical therapy (R. 779).

On April 21, 2010, Plaintiff reported to Dr. Shope that his symptoms were "worse, no better." Dr. Shope recommended Plaintiff undergo carpal tunnel release (R. 783).

Plaintiff participated in individual therapy at Northwood on April 22, 2019. His progress toward his goal was minimal. Plaintiff reported he was "alright." He had been "working on his physical problems." He was "dealing pretty well with his emotional problems." He got along with people and "seldom start[ed] trouble." He was "pretty good" about taking his medication (R. 822).

Plaintiff reported to N.P. Smith, on April 26, 2010, for medication management. Plaintiff reported he was not sleeping well. He felt depressed and anxious. He had had "some cutting episodes last week." Plaintiff had difficulties with concentration and focus; he had difficulty watching television. Plaintiff had racing thoughts. He was uncertain as to whether he had hallucinations. Plaintiff reported right arm and shoulder pain; he had been examined by "several different specialists," which irritated him. He had fleeting suicidal thoughts. N.P. Smith found Plaintiff was cooperative;

his activity was normal; his speech was rapid; his affect was blunted; he was oriented. N.P. Smith found Plaintiff was at a "compensated baseline" and was having difficulty. She prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 824).

On April 27, 2010, Dr. Timms noted that Dr. Naum would not treat Plaintiff because of litigation that resulted from an automobile accident from "several years ago." Dr. Timms noted that Plaintiff had "refused to go see Dr. Chalifoux," but had been treated by Dr. Lechner for his right shoulder. Dr. Timms noted Plaintiff had failed to go to physical therapy, as he was instructed to do by Dr. Lechner. Dr. Timms noted that Plaintiff had requested pain medication from him because he "had an argument with Dr. Chandrasekhar and [was] not going to see him at the present time and [did] not want to go back to Wood Health Care Clinic because he has had problems with them as well." Dr. Timms did not fully examine Plaintiff. His assessment was for probable mild cervical radiculopathy, bursitis of the right shoulder, and carpal tunnel syndrome. Dr. Timms noted Plaintiff was "to see Dr. Shope and to follow up with Dr. Lechner." He advised Plaintiff to go to physical therapy and to be treated at Doctors' Urgent Care or emergency room . . . until he [found] a primary care physician." He prescribed Plaintiff sixty (60) Oxycodone tablets, "and that [was] it." Dr. Timms told Plaintiff he would not prescribe any more pain medication (R. 784).

On May 5, 2010, Dr. Meyers noted Plaintiff was "doing better" relative to his glaucoma; it was under "good control." Dr. Meyers prescribed medication (R. 792).

Plaintiff participated in individual therapy at Northwood on May 6, 2010. His progress was listed as 'slow but steady." Plaintiff reported he had felt "mean" for three (3) days; however, he was "having good days now." He was "getting along with his family." He reported he had cut himself. Plaintiff stated he was "getting better with his medications and [felt] that he has done better over the

past two weeks." He had decreased anxiety and depression (R. 825). It was noted that Plaintiff was taking more responsibility for making choices that benefit him (R. 825-26).

At Plaintiff's May 17, 2010, medication management session with N.P. Smith, Plaintiff reported he was having difficulty falling and staying asleep. He was depressed, anxious, and irritable. He had no "problems with medications." Plaintiff reported his symptoms had been heightened because his cousin committed suicide and his cousin's sister had overdosed on drugs. He had had urges to cut himself, but he had not done so. Plaintiff reported visual hallucinations; he saw bugs and spiders. Plaintiff had been having nightmares about prison and his deceased relatives. N.P. Smith found Plaintiff was cooperative; his appearance was unremarkable; his activity level was normal; his speech was normal; his affect was blunted; and he was oriented. N.P. Smith noted Plaintiff was having situational difficulties due to grief and prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 827).

Plaintiff participated in individual therapy at Northwood on June 3, 2010. Plaintiff stated he had several "things" bothering him: his eyes, he had no pain medication, he had difficulty "dealing with his cousins (sic) death," and he was having difficulty with the State of Ohio and his child support payments. It was noted that Plaintiff was making "minimal" progress toward his goals. Plaintiff stated he wanted to feel better. He stated he had more anxiety and the anxiety was more severe (R. 828).

Plaintiff participated in physical therapy on June 14, 2010 for cervical and lumbar back pain. Plaintiff's cervical ranges of motion were limited due to pain. He had difficulty participating in supine lumbar evaluation due to pain. Plaintiff stated that turning his neck, lifting, bending, walking, or rising from a supine position aggravated pain. He alleviated pain with hot showers, massage, and pain medications (R. 859). At the June 16 and 18, 2010, physical therapy sessions, Plaintiff had minimal increase in pain after exercising (R. 861-62).

On June 17, 2010, Plaintiff participated in individual therapy at Northwood. Plaintiff reported he was doing better; he had not cut himself; his new primary care physician was "helping" him, which "raise[ed] his spirits." Plaintiff stated the only thing that was "making him feel down or anxious" was that he "could lose his mom" (R. 830).

At the June 23 and 30, and July 2 and 8, 2010, physical therapy sessions, Plaintiff stated his low back and leg pain were "4/10"; he had increased pain after exercise (R. 863-66).

At Plaintiff's July 1, 2010, individual therapy session at Northwood, Plaintiff stated he was having difficulties because he had been ill due to eating "bad cereal." Plaintiff stated that, "on the up side," he was going to "start using the van for transportation" and would not have to rely on family members to drive him. Plaintiff stated he had felt like cutting himself because he felt anxious about "some physical problems," but he resisted. Plaintiff stated he was "working on his hobbies and [was] working out in his garden as much as he [was] able." Staying busy helped him keep his mind off his problems (R. 832).

On July 7, 2010, Dr. Meyers noted Plaintiff's eyes were "doing better" and that he was in "good compliance" relative to medicating his glaucoma. It was under "good control" (R. 792).

On July 15, 2010, Plaintiff participated in individual therapy at Northwood. He had made no progress toward his goals in that he was worried he was going to jail because he had "screwed up his child support payment." He was medicating, but he had cut himself (R. 834).

At the July 21 and 23, 2010, physical therapy sessions, Plaintiff stated his low back and leg pain were "4/10"; he had increased pain after exercise. Plaintiff stated he was "very sore from pulling weeds in his garden" (R. 867-68).

Plaintiff presented to N.P. Smith on July 26, 2010, for medication management. Plaintiff stated he had "problems" falling and staying asleep. He felt depressed, anxious, and irritable. He stated he was worried about child support payments that he owed. He had cut himself the previous week. Plaintiff reported visual hallucinations; he saw bugs. Plaintiff had suicidal ideations. N.P. Smith found Plaintiff was cooperative. His activity level was normal, appearance was unremarkable, speech was rapid and rambling, and affect was irritable. He was oriented. N.P. Smith prescribed Seroquel, Cymbalta, Vistaril, and Trileptal (R. 836).

Plaintiff had increased pain after his July 28, 2010, physical therapy session. He stated he had taken two (2) prescription pain pills before therapy so that he "felt good enough to come to therapy" (R. 869).

At the August 4 and 11, 2010, physical therapy sessions, it was noted that Plaintiff did not appear to have any pain or discomfort in his low back while doing his exercises (R. 870-71).

Plaintiff presented to the emergency department of Ohio Valley Medical Center on August 8, 2010 for back, neck, and shoulder pain (R. 851). Plaintiff stated that he had had an appointment with Dr. Chalifoux last Thursday, but it was cancelled due to a power outage; therefore, Plaintiff presented to the emergency department requesting pain medication for a three (3) day period. Plaintiff reported he had been compliant with treatment and was "seeking physical therapy." Upon examination, it was noted that Plaintiff had no limitations. The examination of his head, neck, throat, ears, eyes, cardiovascular system, respiratory system, and abdomen were normal. Plaintiff was neurologically intact. His deep tendon reflexes were "+2/4x4." His muscle strength was 5/5 in legs and arms, bilaterally. He had ful ranges of motion. His extremities were non-tender (R. 852-83). Plaintiff was

treated with an injection of Dilaudid. He was discharged to home in "good condition with a limited amount of Percocet." Plaintiff was instructed to contact Dr. Chalifoux the next day (R. 853).

On August 12, 2010, Plaintiff participated in individual therapy at Northwood. Plaintiff was "up and down emotionally" during his session. He stated he was "doing better but his mother nit pick[ed] and this bother[ed] him." Plaintiff took his medications and did a "good job maintaining his emotions." Plaintiff reported poor sleep, which contributed to anxiety (R. 837).

At his August 13, 2010, physical therapy, Plaintiff reported he was "having a good day"; his pain was at "4/10." His pain increased to "6/10 . . . after therapy but [he] said he still felt pretty good" (R. 872).

Plaintiff presented to N.P. Smith for medication management on August 16, 2010. He stated he was not sleeping well, and he felt depressed, anxious, and irritable. He had nightmares. He reported his depression was 'better than last month." Plaintiff "changed his mind" about cutting himself. Plaintiff hallucinated; he saw bugs. N.P. Smith found Plaintiff was cooperative. His appearance was unremarkable, activity level was normal, speech was normal, and affect was blunted. He was oriented. N.P. Smith prescribed Seroquel, Cymbalta, and Trileptal (R. 839).

At the August 25 and 27, 2010, physical therapy sessions, it was noted that Plaintiff did not appear to have any pain or discomfort in his low back while doing his exercises (R. 873-74).

On August 30, 2010, Plaintiff presented to N.P. Smith for medication management. He stated he was not sleeping well. He felt irritable. He was "edgy" and aggravated about "legal issue and financial problems." Plaintiff reported increased back and shoulder pain. He planned to visit his brother. He had not cut himself. He had fleeting suicidal ideations. He felt paranoid. N.P. Smith found Plaintiff was cooperative. His appearance was unremarkable, activity level was normal, speech

was rapid and pressured, and affect was irritable. Plaintiff was oriented. He had intermittent hallucinations. N.P. Smith prescribed Seroquel, Cymbalta, and Trileptal (R. 840).

Plaintiff participated in individual therapy at Northwood on September 2, 2010. Plaintiff stated he had increased anxiety; his mother was "going off today" and this was "upsetting to him." He had tics and blinked; he had not cut himself (R. 841).

Plaintiff presented to N.P. Smith on September 16, 2010, for medication management. He stated he had no difficulties; however, he was not sleeping well. He felt calm; his mood was "pretty good." He had not been cutting himself. He had fleeting suicidal ideations. He had hallucinations; he saw bugs. N.P. Smith found Plaintiff was cooperative. His appearance was unremarkable, activity level was normal, and speech was normal. He was oriented. N.P. Smith found no acute symptoms. he prescribed Seroquel, Cymbalta, and Trileptal (R 843).

Plaintiff participated in individual therapy at Northwood on September 16, 2010. He stated he was not sleeping well. He was "upset" with his mother because he suspected she talked about him "behind his back." Plaintiff was upset because his daughter had said she wanted him to go to jail. He had isolated himself. He stated he needed to exercise and "get out more" (R. 844). Plaintiff stated he needed "to do things" he enjoyed and to "quit thinking about the past" (R. 845).

On September 29, 2010, the physical therapist noted Plaintiff was discharged "due to noncommunication and nonreturn to PT" (R. 875).

On October 7, 2010, Plaintiff presented to N.P. Smith for medication management. Plaintiff reported he had difficulty falling and staying asleep. He had no mania. He was depressed and irritable. Plaintiff reported a friend had died unexpectedly last week, which had caused him to be "extremely depressed." Plaintiff had cut his legs. N.P. Smith found Plaintiff was oriented and cooperative. He

had intermittent hallucinations. His appearance was unremarkable. His activity level was normal, speech was normal, and affect was blunted. He had suicidal thoughts, but he had no plans or intentions. N.P. Smith prescribed Seroquel, Cymbalta, and Trileptal (R. 846).

On March 5, 2011, M. Aileen Mansuetto, M.A., completed a Disability Determination Examination for West Virginia Disability Determination Services, which included a clinical interview and a mental status examination. Ms. Manseutto noted Plaintiff's grooming and hygiene were adequate; his posture and gait were within normal limits (R. 885). Plaintiff stated his chief complaints were "mental problems," "neck and back problems," carpal tunnel syndrome, leg numbness, hip pain, and sciatic nerve "problems" (R. 885-86). Plaintiff stated he cut himself "in order to 'feel better.'" He had passive suicidal ideations; he denied any attempt or plan. He felt hopeless, helpless, and worthless. His memory and concentration were poor. He reported anhedonia. He stated he had a "bad temper, but that he has never slapped a woman." He fought with others. He did not like to socialize. He saw bugs and spiders. He lost his train of thought and "actually lost his train of thought while he was answering the questions about losing his train of thought." He stated he had been diagnosed with bipolar disorder (R. 886). Plaintiff reported sleep disturbances; he was often awake for three (3) days at a time. His appetite varied; he cried; his energy level was good; his mood was "up and down"; he had no phobias; his panic manifested itself in his becoming nervous or frightened; he denied obsessions; he compulsively counted; he reported nightmares, cold sweats, screaming, and flashbacks relative to PTSD; the right side of his head had facial grimaces and twitches; his eye twitched; he thought he would die due to suicide in the next twenty (20) to thirty (30) years (R. 886-87). Ms. Manseutto noted that Plaintiff's "personality traits may dramatize his report of suicidality" (R. 886). Plaintiff smoked one and one-half (1 ½) packages of cigarettes per day; he drank "at least six Mountain

Dew[]" soft drinks per day (R. 887). Plaintiff stated he drank alcohol excessively when younger, but he had not drunk alcohol during the past two (2) years (R. 887). Plaintiff stated he had smoked marijuana and "tried other drugs" when he was younger. Plaintiff stated he had never been arrested for driving under the influence or public intoxication. Plaintiff reported his father was abusive to him; his father hit him with belts and boards until he was thirteen (13), then he hit him with his fists. Plaintiff had been hospitalized after a beating. Plaintiff reported he lived with his mother and had never been married. Plaintiff reported he was jailed twice for nonpayment of child support (R. 888).

Ms. Mansuetto reviewed Plaintiff's treatment and medication management records from Northwood. She noted Plaintiff had been admitted to Northwood five (5) times (R. 887). Upon mental examination, Ms. Mansuetto found Plaintiff was cooperative, courteous, motivated, and polite. His speech was relevant and coherent; he was oriented to person, place, time, and circumstance. Plaintiff's mood was broad. He exhibited depression, irritability, anxiety, and agitation. He was suspicious and showed paranoia. His affect was broad. Plaintiff's concentration was moderately impaired, based on a score of five (5) on the Digit Span subtest of WAIS. Plaintiff's thought process was tangential, circumscribed, and loose. His thought content was normal (R. 888). Plaintiff's perception was normal; however he reported auditory and visual hallucinations. His psychomotor activity was positive for tics on the right side of his face. Plaintiff's judgment was mildly deficient. He had suicidal ideations, but he was not a danger to himself. Plaintiff's immediate memory was normal; his recent memory was moderately deficient; his remote memory was mildly to moderately deficient. Plaintiff's persistence was mildly to moderately deficient. His pace was within normal limits. His social functioning was "good" during the evaluation; he was verbal and interactive and made good eye contact (R. 889).

Ms. Mansuetto assessed the following: Axis I - major depressive disorder, severe with psychotic features, and chronic motor tic; Axis II - no diagnosis; Axis III - high blood pressure, bone spurs in neck spondylosis of cervical spine, and hepatitis C (by self report). Ms. Mansuetto found that, even though Plaintiff had not been diagnosed with a personality disorder, his "personality features urge[d] him to dramatize and exaggerate symptoms" (R. 889). Ms. Mansuetto found Plaintiff was independent in all activities of daily living. Plaintiff's reported social activity was spending time with friends, which he enjoyed. Plaintiff was capable of managing his own funds (R. 890).

On March 10, 2011, Ms. Mansuetto completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) for Plaintiff. She found Plaintiff's ability to carry out simple instructions was mildly impaired. Ms. Mansuetto found Plaintiff was moderately impaired in his abilities to understand and remember simple and complex instructions, make judgments on simple work-related decisions, carry out complex instructions, and make judgments on complex work-related decisions (R. 891). Ms. Mansuetto found Plaintiff had no limitations in his ability to interact appropriately with the public or co-workers. She found Plaintiff was mildly impaired regarding his ability to interact appropriately with supervisors and to respond appropriately to usual work situations and changes. Ms. Mansuetto found none of Plaintiff's other capabilities was affected. She listed no medical signs, laboratory findings or other factors to support her assessment (R. 892).

On April 4, 2011, Plaintiff's lawyer submitted Plaintiff's handwritten note and editorial comments relative to Ms. Mansuetto's March 5, 2011, mental status examination report to ALJ Dunlap (R. 905). Plaintiff wrote he did attempt to commit suicide while in jail in 2007. He thought about suicide daily, and those thoughts include jumping off a bridge, cutting his wrists or throat, driving a car into a wall, and "eating a bullit (sic)." He thought he would die as a result of suicide, which could

occur in one (1) year or sooner. Plaintiff was not suicidal as he wrote the comments, but he felt suicide was a "part" of him. He rarely went anywhere. He had PTSD due to a burn, being in jail, and being involved in automobile accidents (R. 906). He had been arrested for public intoxication in the past. He had been married twice. He had been "told by Northwood that [he had] a personality disorder by Monica Smith but [he did not] know if it's documented" (R. 907, 908-13).

Also, on April 4, 2011, Plaintiff's counsel submitted a document titled "Response to Proposed Exhibit 51F," which was Ms. Mansuetto's consultative mental status examination report, to ALJ Dunlap. Therein, counsel asserted that Plaintiff met the criteria for medical listing 12.04 (R. 918).

Administrative Hearing

Plaintiff testified he did not have a valid driver's license because it was revoked for nonpayment of a citation for driving without a license (R. 40-41). Plaintiff stated his concentration was "not good enough" for him to drive; he would run stop lights and signs (R. 41). Plaintiff testified his last job was as a pizza delivery person. He quit that job because he and his wife had separated, he had difficulty concentrating, and he was "having a hard time." Plaintiff testified he had been incarcerated in the State of Ohio for failure to pay child support (R. 42-43). Plaintiff stated he lived with his mother. She had horses. He did not ride because of disinterest and pain (R. 43-44). Plaintiff did not care for the horses; he gave them apples and carrots at times (R. 44). Plaintiff stated he drew cartoons; however, his hands hurt. He watched television (R. 45).

Upon questioning by counsel, Plaintiff testified he did not know why he waited two (2) years after he stopped working to file his disability application; he stated he "thought he did." Plaintiff stated his mother and sister encouraged him to file his disability application (R. 46).

Plaintiff stated his concentration was not "very good at all." He had hand, back, neck, and leg pain. Plaintiff had just undergone right hand carpal tunnel release surgery. Plaintiff testified his left hand was not "as bad" as the right. Plaintiff stated the 2005 automobile accident "hurt [him] worse" (R. 47). Plaintiff stated he had migraine headaches. Plaintiff stated he had not been treated for hepatitis C because he had gone to jail and not kept or made another appointment for that condition (R. 48). Plaintiff stated that the "pain doctor" was "helping" him "very much" with medications and injections (R. 51). Plaintiff testified he had been treated for depression, anxiety, and bipolar syndrome at Northwood Health Systems. He underwent therapy every two (2) weeks and was prescribed medications monthly (R. 49). Plaintiff testified his mental health treatment was "helping" him "a lot" (R. 50, 55). Plaintiff testified he had not been hospitalized during the past year for mental health treatment, but "they wanted to lock [him] up three or four times, but [he] talked them out of it" (R. 50). Plaintiff stated he was "scared to be locked up" and he did not want his "freedom taken" (R. 51). Plaintiff testified he no longer had a primary care physician because he "got in an argument" and "quit going to him" (R. 51). Plaintiff could not remember the reason for the disagreement (R. 52). Plaintiff testified he was being treated for glaucoma and his eyes "bother[ed] [him] a lot" (R. 52). Plaintiff stated his medications caused sleepiness, drowsiness, constipation, dry mouth, forgetfulness (R. 53).

Plaintiff testified he "usually" laundered his clothes, drew, and watched television. He read the paper "if [he felt] good." His mother cooked all the meals and shopped for food. Plaintiff "sometimes" shopped for groceries. Plaintiff left the house to go to doctors' appointments (R. 54). Plaintiff visited his brother "every once in a while." He stayed home and had stayed home for the past three (3) or four (4) years (R. 55). Plaintiff testified he had not drunk alcohol in a "long time" – for a year or a year and

a half. Plaintiff stated it could have been as long as two (2) years (R. 56-57). Plaintiff testified he had

not smoked marijuana for years. He had difficulty remembering when to take his medication (R. 57).

The ALJ asked the VE the following hypothetical question:

> Assume an individual between ages 46 and 48 with a high school education and the
> past relevant work of the claimant. Assume that physically this individual can lift 20
> pounds occasionally, 10 pounds frequently, stand and walk six hours, and sit six
> hours during eight hour work day. That this individual can only occasionally tolerate
> exposure to cold temperatures, vibration and hazards such as moving machinery.
> Mentally, let's assume that this individual can understand, remember and carry out
> only the shortest and most simple instructions as demanded in jobs rated by the
> Dictionary of Occupational Titles at reasoning level one. He cannot interact with the
> general public and cannot tolerate the stresses of fast paced work or high production
> quotas. Could such an individual perform any of the past work of the claimant? (R.
> 59-60).

The VE testified that such an individual could not perform Plaintiff's past work but could

perform the work of picker, inspector, and sorter (R. 60-61).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. § 416.920 (1997), ALJ Charlie Paul Andrus made the following findings:

1.  The claimant has not engaged substantial gainful activity since October 20,
    2008, the application date (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: multi-level cervical
    spondylosis; degenerative disc disease at lumbar spine level L5/S1; mild
    impingement syndrome of right acromioclavicular joint; mild left carpal tunnel
    syndrome; moderate to severe right carpal tunnel syndrome; history of
    Hepatitis C without end stage complications; major depressive disorder with
    anxiety; history of alcohol dependence; and borderline personality disorder (20
    CFR 416.920).

3.  The claimant does not have an impairment or combination of impairments that
    meets or medically equals one of the listed impairments in 20 CFR Part 404,
    Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  The claimant can lift 20 pounds occasionally and 10 pounds frequently; stand/walk six hours and sit six hours during an eight-hour workday; and can only occasionally tolerate exposure to cold temperatures, vibration, and hazards such as moving machinery. He can understand, remember, and carry out only the shortest and most simple instructions as demanded in jobs rated by the *Dictionary of Occupational Titles* at Reasoning Level One; cannot interact with the general public; and cannot tolerate the stresses of fast paced work or high production quotas.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on January 19, 1962, and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills I(See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since October 20, 2008, the date the application was filed (20 CFR 416.920(g)) (R. 18-27).

## IV.  DISCUSSION

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether the ALJ's findings of fact "are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion."

Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.    Plaintiff met the disability standard under the Act.

    A.    The decision does not "comport" with HALLEX I-2-8-40 (Plaintiff's brief at p. 10).

    B.    The "medical evidence[,] in its totality[,] satisfied Medical Listing 12.04" (Plaintiff's brief at p. 12).

    C.    The "decision does not properly address the opinion of [Plaintiff's] treating physician" (Plaintiff's brief at pp. 13-4).

    D.    "There is no proper credibility determination in the record of Plaintiff's testimony" (Plaintiff's brief at p. 14).

The Commissioner contends:

    A.    Plaintiff was not deprived of due process or a fair administrative hearing (Defendant's brief at p. 10).

    B.    Plaintiff did not meet or equal listing 12.04 at step three of the sequential evaluation (Defendant's brief at p. 13).

    C.    The ALJ gave appropriate weight to Dr. Chandrasekhar's opinion (Defendant's brief at p. 16).

81

## C. Compliance with HALLEX

Plaintiff first argues that the ALJ's decision does not comport with HALLEX I-2-8-40.

Defendant contends Plaintiff was not deprived of due process or a fair administrative hearing.

HALLEX is a "manual in which the Associate Commissioner of Hearings and Appeals conveys

guiding principles, procedural guidance and information to the office of Hearings and Appeals (OHA)

staff." Melvin v. Astrue, 602 F. Supp.2d 694, 699 (E.D.N.C. 2009)(cited with approval in Harris v.

Astrue, 2013 WL 1187151 (N.D.W.Va. 2013)).

> HALLEX I-2-8-40 provides as follows:
>
> When an Administrative law Judge (ALJ) who conducted a hearing in a case is not available to issue the decision because of . . . other cause resulting in prolonged leave of twenty or more days, the Hearing Office Chief ALJ (HOCALJ) will reassign the case to another ALJ. The ALJ to whom the case is reassigned will review the record and determine whether or not another hearing is required to issue a decision. The ALJ's review will include all of the evidence of record, including the audio recording of the hearing.
>
> If the ALJ is prepared to issue a fully favorable decision, another hearing would not be necessary.
>
> If the ALJ is prepared to issue a less than favorable decision, another hearing may be necessary. For example, another hearing would be necessary if relevant vocational expert opinion was not obtained at the hearing, or the claimant alleged disabling pain, and the ALJ believes the claimant's credibility and demeanor could be a significant factor in deciding the case.

The Fourth Circuit has not provided any guidance regarding the issue of whether HALLEX

is judicially enforceable. This district has, however. As also stated in Harris, HALLEX is "an

internal Social Security Administration policy manual . . . [that] does not impose judicially

enforceable duties on either the ALJ or [the] court." (Citing Lockwood v. Comm'r. Soc. Sec. Admin.,

616 F.3d 1068 (9th Cir. 2010); see also Allen v. Astrue, 2010 WL 2196530 (N.D.W.Va. May 28,

2010)(in which the Honorable District Judge Frederick P. Stamp, Jr., stated that "HALLEX, as an internal guidance tool, 'lacks the force of law'")(internal citations omitted). Therefore, a failure to comply with HALLEX, if one did occur, does not mandate remand.

Furthermore, even if HALLEX were binding and a source of a remedy, the plaintiff must establish that the failure to comply with HALLEX resulted in prejudice. See Melvin, supra, at 704. The Fifth and Eleventh Circuits have addressed the issue. In Shave v. Apfel, 238 F.3d 592 (5th Cir. 2001) the Fifth Circuit found that a second hearing was not required in that case because the ALJ's rejection of the claimant's credibility was based not on his demeanor or a factor that could be observed in a live hearing, but on a combination of medical evidence and the conflict between his hearing testimony and his previous characterization of his condition. In George v. Astrue, 338 Fed. Appx. 803, 2009 WL 1950266 (11th Cir. 2009)(unpublished),[2] the Eleventh Circuit held:

> Here, even if we assume that section I-2-8-40 of HALLEX carries the force of law - - a very big assumption - - the ALJ did not violate it because the provision does not mandate a new hearing any time the ALJ is not prepared to accept the claimant's allegations . . . . Nor does the plain language of HALLEX section I-2-8-40 require that the ALJ make a specific finding as to the claimant's demeanor . . . .In this case, the ALJ did not make any findings concerning [claimant's] demeanor, but rested the credibility determination on the fact that his statements concerning the intensity, persistence, and limiting effects of such symptoms were not entirely credible when compared with the objective medical evidence on the record. Thus, the ALJ's decision was based on evidence from the existing record and the transcript from the hearing, and a second hearing would not have added in any meaningful way to the record. Accordingly, the ALJ did not err by failing to hold a new hearing.

Id. at 805 (citing Shave, supra).

In the present case, as in both Shave and George, the ALJ's rejection of Plaintiff's credibility was not based on his demeanor or a factor that could be observed in a live hearing, but on a

--------

[2]The decision is attached hereto.

combination of the medical evidence, Plaintiff's testimony, and his reports to health care providers. The ALJ did not make any findings regarding Plaintiff's demeanor.

Plaintiff further argues that the ALJ did not comply with HALLEX I-2-1-40, which requires that the judge who held the hearing approve a final decision draft that is thereafter signed on behalf of that judge by a different ALJ. This case does not involve I-2-1-40, however, as there is no indication that the previous ALJ approved a final decision draft that the second ALJ merely signed. Instead, she had issued instructions for the decision. The second ALJ did not simply sign on her behalf, but instead considered the evidence and record of the hearing himself. He stated he concurred with the first ALJ's conclusions, but the written decision was his own.

Plaintiff later argues that the ALJ's credibility finding was improper, pointing out that the ALJ "was not present to witness the Plaintiff in pain during the hearing, to see the Plaintiff via teleconference screen, to see the Plaintiff getting up during the hearing due to severe pain, and simply - - by virtue of not conducting a new hearing - - capable of assessing credibility in this matter." (Plaintiff's brief at 14.) The undersigned will address this argument in the section of this decision dealing with the ALJ's credibility determination.

Based on all of the above, the undersigned finds the ALJ did not fail to comply with HALLEX I-2-8-40 or I-2-1-40, and, even if he did, that failure would not require remand.

### D. Listing 12.04

Plaintiff next argues that the medical evidence in its totality, satisfied Medical Listing 12.04. (Plaintiff's brief at p. 12). Defendant contends Plaintiff did not meet or equal the Listing. Listing 12.04 provides as follows:

12.04 *Affective Disorders:* Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or
i. Hallucinations, delusions, or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or
e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

The ALJ here found Plaintiff had major depressive disorder with anxiety and borderline personality disorder (R. 20). He therefore expressly found, and the medical record supports, that Plaintiff meets the requirements of 12.04A. He then found, however, that Plaintiff did not meet either the B or C requirements. He found Plaintiff had moderate restriction of activities of daily living, mild difficulties in social functioning, and moderate difficulties in regard to concentration, persistence or

pace. The ALJ also found that Plaintiff had no repeated episodes of decompensation, each of extended duration.

The ALJ expressly relied on the consultative examination by Ms. Mansuetto and reports and testimony by Plaintiff that had inconsistencies. 12.00E provides, however:

> *Chronic Mental Impairments.* Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. For instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate. <u>The results of a single examination may not adequately describe your sustained ability to function</u>. It is, therefore, vital that we review all pertinent information relative to your conditions, especially at times of increased stress. We will attempt to obtain adequate descriptive information from all sources that have treated you in the time period relevant to the determination or decision.

(Emphasis added). It is undisputable that Plaintiff has a long history of "repeated hospitalizations or prolonged outpatient care with supportive therapy and medication." The ALJ does not even mention in his decision, however, the "descriptive information" from Plaintiff's treating mental healthcare providers, except for one line in his credibility analysis which is taken out of context, and will be discussed later in this opinion.

The ALJ's reliance on Ms. Mansuetto's one-time examination is further troubling because of what the undersigned views as internal inconsistencies. Ms. Mansuetto conducted a clinical interview and mental status examination. She found his concentration was moderately impaired based on the Digit Span test. She noted, however, he lost his train of thought during the interview and "actually lost his train of through while he was answering the questions about losing his train of thought." 12.00C.3 provides as follows:

Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits
. . . .

We must exercise great care in reaching conclusions about your ability or inability to compete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination of psychological testing by a clinician, or based on your ability to complete tasks in other settings that are less demanding, highly structure, or more supportive. We must assess your ability to complete tasks by evaluating all the evidence, with an emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.

We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature of an overall degree of interference with function. You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks. Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

(Emphasis added).

The undersigned cannot determine whether the ALJ's finding that Plaintiff "has experienced no episodes of decompensation, which have been of extended duration" is supported by substantial evidence, because he does not explain that conclusion. The ALJ defines "[r]epeated episodes of

decompensation, each of extended duration," as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." (R. 22). This is not the entire definition, however. 12.00C.4 provides as follows:

> *Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.
>
> The term *repeated episodes of decompensation, each of extended duration* in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. <u>If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.</u>

(Emphasis added). There is substantial evidence in the record that Plaintiff has had "episodes of decompensation," as defined in the Regulation, although not all during the time frame of his application. The medical record indicates he was admitted to Northwood for crisis stabilization for two weeks in January 2007; at least 12 days in March 2007 (terminated because he was incarcerated for failure to pay child support); and two days in December 2007(after his release from jail. He was then terminated again due to admission at Ohio Valley Medical Center.) On March 10, 2008, therapist Weitzel suggested Plaintiff "check[ ] himself into an inpatient facility" because he was taking a large amount of medicine, was not feeling better, may need further assessment, did not associate with others often, and had suicidal ideations. Plaintiff refused inpatient treatment at the crisis stabilization unit. Therapist Weitzel noted Plaintiff was making progress in identifying negative and

irrational thoughts in therapy, but he did not do "well on his own." [3] On December 28, 2008, Plaintiff was transported to the emergency department of Ohio Valley Medical Center due to intoxication. Plaintiff's blood work showed the presence of alcohol (297 mg/dl) and benzodiazepines. He was released to Northwood.

On May 18, 2009, Plaintiff's treatment at Northwood was terminated again due to incarceration. After his release from jail, he presented to the hospital ER. He reported he had had no medications since he was released three days earlier, and was depressed and suicidal. Upon discharge he was advised to admit himself to Northwood. He did so, but not for three weeks. His stated reason for the delay was that he was afraid of being "locked up" again. He remained in crisis stabilization for eight days.

Besides his inpatient treatment, Plaintiff was in outpatient treatment with therapists, psychiatrists, and on medication for most of the four years between his application and the ALJ's decision. During the relevant time, Plaintiff's Global Assessment of Functioning ("GAF") ranged from 21 to 35. A GAF of 31-40 indicates: "**Some impairment in reality testing or communication** (e.g., speech is at times illogical, obscure or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work) Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original). Dr. Corder, after a full examination, found it to be 21 in March 2010. A GAF of 21-30 indicates **Behavior is considerably influenced**

---

[3]The undersigned recognizes these admissions were prior to Plaintiff's application and therefore are not within the relevant time frame; however, the ALJ expressly stated: "Although supplemental security income is not payable prior to the month following the month in which the application was filed [] the undersigned has considered the complete medical history consistent with 20 CFR 416.912(d).

**by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day, no job, home, or friends). Id.

Based on all of the above, the undersigned concludes that substantial evidence does not support the ALJ's determination that Plaintiff did not meet or medically equal any listed impairment. In so concluding, the undersigned does not find that Plaintiff does meet or equal any listing, but finds only that the case should be remanded for further consideration.

### E. Treating Physician Opinion

Plaintiff next argues the ALJ's decision does not properly address the opinion of his treating physician. (Plaintiff's brief at pp. 13-4). Defendant contends the ALJ gave appropriate weight to Dr. Chandrasekhar's opinion. (Defendant's brief at p. 16). There is no dispute that Dr. Chandrasekhar is a treating physician. In Craig v. Chater, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
>> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

In December 2008, Dr. Chandrasekhar opined that Plaintiff could not sit or stand/walk two hours a day. The ALJ rejected this opinion, stating it was inconsistent with the medical evidence showing Plaintiff had good strength in his lower extremities, walked without difficulty, and had

intact reflexes and sensory; an MRI that noted only some degenerative changes at L5/S1; and Plaintiff's statements that he was doing pretty well in regards to his low back as well as that he walked and rode horses.

Plaintiff argues that he specifically testified that he does not ride horses and "there's no confirmation that would indicate otherwise." Records of Plaintiff's visits with his treating therapist in 2009, however, do indicate he walked and rode horses (R. 700, 705). Further, in December 2009, Dr. Timms found Plaintiff had good strength in his legs, had an "equivocal" straight leg raising test; and walked without difficulty. In January 2010, he "seemed to be doing pretty well from his neck and lower back pain." Plaintiff said his pain was well controlled with medications. In March 2010, he "walked without difficulty." MRI showed only "some degenerative changes." In July 2010, he was working on his hobbies and working out in his garden as much as he was able. On July 21st and 23rd, he reported being "very sore from pulling weeds in his garden." In August 2010, he presented to the ER because he was out of medications for three days. Upon examination he had full strength, full range of motions, and his extremities were all non-tender. During physical therapy in August 2010, it was noted that he "did not appear to have any pain or discomfort in his low back while doing exercises." In March 2011, psychologist Mansuetto noted his posture and gait were both within normal limits. State Agency reviewing physician Lateef found Plaintiff could stand/walk and sit for six hours each within an eight-hour workday.

The undersigned finds substantial evidence supports the ALJ's rejection of Dr. Chandrasekhar's opinion that Plaintiff could sit or stand/walk only up to two hours in an 8-hour workday.

## F. Credibility

Plaintiff next argues, "There is no proper credibility determination in the record of Plaintiff's testimony" (Plaintiff's brief at p. 14). The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976). As already noted, however, the ALJ who wrote the decision did not have the opportunity to observe the demeanor and determine the credibility of the claimant. The undersigned must therefore consider the ALJ's credibility determination by evaluating only what he states he did consider.

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers.* The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific

93

descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594. Plaintiff clearly met the first prong of the analysis. The ALJ was therefore required to take into account "all the available evidence."

As already noted, the ALJ did not discuss Plaintiff's long-time treating mental health providers at Northwood. The ALJ based his credibility determination in large part on what he viewed as inconsistencies between Plaintiff's statements at different times. He emphasized Plaintiff's testimony that he stopped drinking in October 2008, noting that he was intoxicated in December 2008 and March 2009. Plaintiff explained the 2009 drinking as a result of finding out he was going back to jail. He also noted Dr. Corder's opinion that Plaintiff's increase in symptoms could be the result of substance abuse or antidepressants, the symptoms of either which includes mood instability. Dr. Corder explained, however, that Plaintiff's prescribed medications could very likely have cause the symptoms.

The ALJ also noted Dr. Mansuetto's opinion that Plaintiff's reported symptoms are "dramatized and exaggerated due to his borderline personality disorder." The ALJ accorded great weight to Dr. Mansuetto's opinion that despite his depressive disorder, he could still function well in carrying out simple instructions, interaction with supervisors and coworkers, and responding to work situations and changes in a routine work setting. As already noted, however, Dr. Mansuetto also specifically found Plaintiff's mood was one of depression, irritability, anxiety, and agitation; that he was suspicious and showed some paranoia; that his thought process was tangential, circumscribed, and loose; that he lost his train of thought several times during the evaluation; and that he lost his train of thought and stuttered at the beginning of sentences. Notably, she stated he even lost his train of thought while discussing his train of thought.

Most significant, however, is Dr. Mansuetto's diagnosis of major depressive disorder, severe, with psychotic features and chronic motor tic disorder and "personality features." As to the latter, she wrote:

> Although the claimant has not been diagnosed with the personality disorder, it may be that personality features urge him to dramatize and exaggerate symptoms. His passive suicidal ideation with histrionic threats to jump off local bridges would support the likelihood that a personality disorder exists. His treating clinicians at Northwood should rule out the presence of a personality disorder. The claimant's prognosis worsens if a personality disorder is diagnosed.

In fact, in March 2008, a licensed psychologist at Northwood did perform an evaluation of Plaintiff. Test results "indicated the probable presence of . . . a severe personality disturbance." His scores showed elevations in scales for depressive personality disorder and borderline personality disorder. Further, the ALJ expressly found Plaintiff had borderline personality disorder, a severe impairment. As part of his determination that Plaintiff was not entirely credible, however, the ALJ cited Dr. Mansuetto's opinion that Plaintiff's symptoms were "dramatized and exaggerated due to his borderline personality disorder."

According to the National Institute of Mental Health ("NIMH") borderline personality disorder is "a serious mental illness marked by unstable moods, behavior, and relationships."[4] Further, "[m]ost people who have BPD suffer from problems with regulating emotions and thoughts, impulsive and reckless behavior, and unstable relationships with other people. People with this disorder also have high rates of co-occurring disorder, such as depression, anxiety disorders, substance abuse . . . along with self-harm, suicidal behaviors, and completed suicides."[5]

_____

[4] www.nimh.nih.gov/health/topics/borderline-personality-disorder (Accessed October 21, 2013)

[5] Id.

In order to be diagnosed (which Plaintiff was) with borderline personality disorder, a person must show an enduring pattern of behavior that includes <u>at least five</u> of the following symptoms:

- Extreme reaction - - including panic, depression, rage or frantic actions – to abandonment, whether real or perceived;

- A pattern of intense and stormy relationships with friends, family, and loved ones, often veering from extreme closeness and love . . . to extreme dislike or anger;

- Distorted and unstable self-image or sense of self, which can result in sudden changes in feelings, opinions, values, or plans and goals for the future . . . . ;

- Impulsive and often dangerous behaviors, such as spending sprees, unsafe sex, substance abuse, reckless driving, and binge eating;

- Recurring suicidal behaviors or threats or self-harming behavior, such as cutting;

- Intense and highly changeable moods, with each episode lasting from a few hours to a few days;

- Chronic feelings of emptiness and/or boredom;

- Inappropriate, intense anger or problems controlling anger;

- Having stress-related paranoid thoughts or severe dissociative symptoms, such as feeling cut off from oneself, observing oneself from outside the body, or losing touch with reality.

. . . .

Self-injurious behavior includes suicide and suicide attempts, as well as self-harming behaviors . . . As many as 80 percent of people with BPD had suicidal behaviors, and about 4 to 9 percent commit suicide . . . . Self harming behaviors linked with BPD include cutting . . . . People with BPD may self-harm to help regulate their emotions, to punish themselves, or to express their pain. They do not always see these behaviors as harmful. . . . .

Other illnesses that often occur with BPD include diabetes, high blood pressure, <u>chronic back pain</u>, arthritis, and fibromyalgia . . . .[6]

(Emphasis added). Besides Plaintiff's actual diagnosis of borderline personality disorder, the medical record contains substantial evidence he displayed those symptoms.

The undersigned finds the ALJ did not properly take into account Plaintiff's borderline personality disorder in evaluating his credibility. The ALJ considered this mental disorder, which he found was severe, contributed to Plaintiff's being <u>less</u> credible, whereas the medical literature indicates many of Plaintiff's statements and behaviors are symptoms of the disorder. Even Dr. Mansuetto, upon whom the ALJ relied, opined that Plaintiff's prognosis worsened if he were diagnosed with a personality disorder.

Based on the above, the undersigned concludes that substantial evidence does not support the ALJ's determination that Plaintiff's statements concerning the intensity, persistence and limiting effects of [his] symptoms were not credible to the extent they were inconsistent with the [ALJ's] residual capacity assessment.

## V.  RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is not supported by substantial evidence, and I accordingly recommend that the Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion for Summary Judgment be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation; and that this action be **DISMISSED and RETIRED** from the Court's docket.

---

[6]<u>Id.</u>

Any party may, within fourteen (14) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Gina Groh, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit an authenticated copy of this Report and Recommendation to counsel of record

Respectfully submitted this _25_ day of October, 2013.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

338 Fed.Appx. 803, 2009 WL 1950266 (C.A.11 (Fla.))
(Not Selected for publication in the Federal Reporter)

(Cite as: 338 Fed.Appx. 803, 2009 WL 1950266 (C.A.11 (Fla.)))

**c**

This case was not selected for publication in the Federal Reporter.
Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Eleventh Circuit Rules 36-2, 36-3. (Find CTA11 Rule 36-2 and Find CTA11 Rule 36-3)

United States Court of Appeals,

Eleventh Circuit.
Anthony GEORGE, Plaintiff–Appellant,
v.
Michael J. ASTRUE, Commissioner, Social Security Administration, U.S. Attorney General, Defendants–Appellees.
No. 09–10147

Non–Argument Calendar.
July 8, 2009.

**Background:** Claimant sought judicial review of an administrative law judge's (ALJ's) denial of his application for disability benefits and supplemental security income (SSI) benefits. The United States District Court for the Southern District of Florida, No. 08-80042-CV-FJL, affirmed, and claimant appealed.

**Holdings:** The Court of Appeals held that:

(1) the ALJ, who was assigned to this case after the ALJ who conducted the hearing went on extended military leave, did not violate the Hearings, Appeals, and Litigation Law Manual (HALLEX) when he issued an opinion without holding a new hearing, and
(2) the ALJ did not err in basing his decision on the original record in this case.

Affirmed.

West Headnotes

[1] Social Security 356H �köö205

356H Social Security

    356HIII Proceedings
        356Hk203 Hearing
            356Hk205 k. Necessity; right to hearing. Most Cited Cases
      (Formerly 356Ak142.5 Social Security and Public Welfare)
      Administrative law judge (ALJ), who was assigned to claimant's case after the ALJ who conducted claimant's hearing went on extended military leave, did not violate the Hearings, Appeals, and Litigation Law Manual (HALLEX) when he issued an opinion denying claimant's application for disability insurance benefits and supplemental security income (SSI) benefits without holding a new hearing; HALLEX does not mandate a new hearing any time the ALJ is not prepared to accept a claimant's allegations, nor does it require the ALJ to make a specific finding as to the claimant's demeanor, and here, the ALJ's decision was based on evidence from the existing record and the transcript from the hearing, such that a second hearing would not have added in any meaningful way to the record.

[2] Social Security 356H ⊫kö209(1)

356H Social Security

    356HIII Proceedings
        356Hk206 Scope of Inquiry on Claim; Matters Considered; Development of Record
        356Hk209 Disability Benefits
            356Hk209(1) k. In general. Most Cited Cases
      (Formerly 356Ak142.5 Social Security and Public Welfare)
  **Social Security 356H ⊫kö267**

356H Social Security

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

338 Fed.Appx. 803, 2009 WL 1950266 (C.A.11 (Fla.))
(Not Selected for publication in the Federal Reporter)

(Cite as: 338 Fed.Appx. 803, 2009 WL 1950266 (C.A.11 (Fla.)))

356HIV Judicial Review or Intervention
    356Hk264 Harmless Error
        356Hk267 k. Disability benefits. Most Cited Cases
        (Formerly 356Ak145 Social Security and Public Welfare)
    Administrative law judge (ALJ) did not err in basing his decision, denying claimant's application for disability insurance benefits and supplemental security income (SSI) benefits, on the original record in the case; even assuming the ALJ erred by failing to obtain certain records from a hospital or the state's department of corrections, claimant made no allegation of prejudice.

*803 Michael A. Steinberg, Michael A. Steinberg & Associates, Tampa, FL, for Plaintiff–Appellant.

*804 Christina Young Mein, Kansas City, MO, for Defendants–Appellees.

Appeal from the United States District Court for the Southern District of Florida. D.C. Docket No. 08–80042–CV–FJL.

Before BIRCH, HULL and MARCUS, Circuit Judges.

PER CURIAM:

**1 Anthony George appeals from the district court's order affirming the administrative law judge's ("ALJ") denial of his application for disability insurance benefits and supplemental security income ("SSI") benefits, 42 U.S.C. §§ 405(g) and 1383(c)(3). The ALJ who conducted George's hearing went on extended military leave, and a new ALJ issued an opinion in George's case without holding a new hearing. On appeal, George argues that: (1) the second ALJ did not comply with the Hearings, Appeals, and Litigation Law Manual ("HALLEX") because he did not hold a new hearing and did not state whether he took the fact that George's credibility and demeanor could be a significant factor in deciding the case into consideration before determining that a new hearing was unnecessary; and (2) the ALJ did not develop a full and fair record because it did not request records from

Jackson Memorial Hospital or subpoena records from the Florida Department of Corrections ("FL DOC"). After careful review, we affirm.

"Judicial review of the administrative decision [determining social security benefits] is limited to a determination of whether the findings of the Secretary are supported by substantial evidence." Ford v. Secretary of Health and Human Services, 659 F.2d 66, 68 (5th Cir. Unit B 1981).[FN1] "However, the administrative decision is not supported by substantial evidence if the administrative law judge does not have before him sufficient facts on which to make an informed decision." Id. at 69. Although we have not stated a precise standard of review for the ALJ's decision regarding holding a new hearing or developing a record, we need not decide which standard of review to apply, as we discern no error here under even a de novo standard of review. Cf. United States v. Arbolaez, 450 F.3d 1283, 1293 (11th Cir.2006).

FN1. See Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir.1982) (adopting all post-September 30, 1981 decisions of Unit B of the former Fifth Circuit as binding precedent in the Eleventh Circuit).

[1] First, we reject George's claim that the second ALJ did not comply with the HALLEX. Under HALLEX, when an ALJ who conducted a hearing in a case becomes unavailable, the ALJ to whom the case is reassigned reviews the record to determine whether a new hearing is required. HALLEX § I–2–8–40. The new ALJ reviews the entire record, including the audio recording of the hearing, and "[i]f the ALJ is prepared to issue a fully favorable decision, another hearing would not be necessary," but "[i]f the ALJ is prepared to issue a less than fully favorable decision, another hearing may be necessary. For example, another hearing would be necessary if ... the claimant alleges disabling pain, and the ALJ believes the claimant's credibility and demeanor could be a significant factor in deciding the case." Id. In Shave v. Apfel, 238 F.3d 592, 596–97 (5th Cir.2001), the Fifth Circuit addressed this specific HALLEX provision, and found that a second hearing was not required in that case because the ALJ's rejection of the claimant's credibility was based not on his demeanor or a factor that could be observed in a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

338 Fed.Appx. 803, 2009 WL 1950266 (C.A.11 (Fla.))
(Not Selected for publication in the Federal Reporter)

(Cite as: 338 Fed.Appx. 803, 2009 WL 1950266 (C.A.11 (Fla.)))

live hearing, but on a combination of medical **805** evidence and the conflict between his hearing testimony and his previous characterization of his condition.

**2 Here, even if we assume that § I–2–8–40 of HALLEX carries the force of law—a very big assumption—the ALJ did not violate it because the provision does not mandate a new hearing any time the ALJ is not prepared to accept the claimant's allegations. *See* HALLEX § I–2–8–40 ("[i]f the ALJ is prepared to issue a less than fully favorable decision, another hearing *may* be necessary" (emphasis added)). Nor does the plain language of HALLEX § I–2–8–40 require that the ALJ make a specific finding as to the claimant's demeanor. *See* HALLEX § I–2–8–40. In this case, the ALJ did not make any findings concerning George's demeanor, but rested the credibility determination on the fact that his statements concerning the intensity, persistence, and limiting effects of such symptoms were not entirely credible when compared with the objective medical evidence on the record. Thus, the ALJ's decision was based on evidence from the existing record and the transcript from the hearing, and a second hearing would not have added in any meaningful way to the record. Accordingly, the ALJ did not err by failing to hold a new hearing. *See Shave,* 238 F.3d at 596–97.

[2] We also find no merit in George's claim that the ALJ did not develop a full and fair record. We recognize that regardless of whether a claimant is represented by counsel, the ALJ "has a duty to develop a full and fair record." *Brown v. Shalala,* 44 F.3d 931, 934 (11th Cir.1995). Nonetheless, we have indicated that "there must be a showing of prejudice before we will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record." *Id.* at 935. Before ordering a remand, we will review the administrative record as a whole to determine if it is inadequate or incomplete or "show[s] the kind of gaps in the evidence necessary to demonstrate prejudice." *Graham v. Apfel,* 129 F.3d 1420, 1423 (11th Cir.1997).

Even assuming that the ALJ erred by failing to obtain records from Jackson Memorial Hospital or the FL DOC,

George must show that he was prejudiced by this failure. *See Brown,* 44 F.3d at 935. But George makes no allegation of prejudice. He does not argue that the records from Jackson Memorial Hospital contain any evidence that would have been pertinent to the ALJ's decision, and he specifically testified that since being incarcerated he had not received any medical treatment except a physical. Accordingly, the ALJ did not err in basing his decision on the original record in this case.

**AFFIRMED.**

C.A.11 (Fla.),2009.

George v. Astrue
338 Fed.Appx. 803, 2009 WL 1950266 (C.A.11 (Fla.))
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.